1                     UNITED STATES OF AMERICA
                 UNITED STATES DISTRICT COURT
2                SOUTHERN DISTRICT OF CALIFORNIA

3                         - - -

4                 HONORABLE THOMAS J. WHELAN
           UNITED STATES DISTRICT JUDGE PRESIDING
5                         - - -

6  UNITED STATES OF AMERICA,  )
                       )
7        PLAINTIFF,      )
                       )
8  VS.                 ) NO. 10CR1372W
                       )
9  JONATHAN LEAL-DEL CARMEN,  )
                       )
10       DEFENDANT.      )
  _____)
11

12

13                   **JURY TRIAL - DAY TWO**
            REPORTER'S TRANSCRIPT OF PROCEEDINGS
                **NOVEMBER 17, 2010**
14               SAN DIEGO, CALIFORNIA

15

16

           MELISSA A. PIERSON, CSR 12499, RPR
17           FEDERAL OFFICIAL COURT REPORTER
           940 FRONT STREET, ROOM 3155
18          SAN DIEGO, CALIFORNIA 92101
             PH:  (619)702-7508
19          PIERSON1121@SBCGLOBAL.NET

20

21

22

23

24

25

```
1    APPEARANCES OF COUNSEL:

2    ON BEHALF OF PLAINTIFF:
               LAURA E. DUFFY
3              UNITED STATES ATTORNEY
               BY:  MR. STEPHEN MILLER, ESQ.
4              ASSISTANT UNITED STATES ATTORNEYS
               880 FRONT STREET
5              FIFTH FLOOR
               SAN DIEGO, CA 92101
6

7    ON BEHALF OF DEFENDANT:
               FEDERAL DEFENDERS OF SAN DIEGO
8              BY:  MR. HANNI M. FAKHOURY, ESQ.
               BY:  MR. DAVID M.C. PETERSON, ESQ.
9              225 W. BROADWAY
               ST. 900
10             SAN DIEGO, CA 92101
               (619) 234-8467
11
```

12   **WITNESS:**

13   **BRIAN PECHT**

```
14       DIRECT EXAMINATION BY MR. MILLER:        54
         CROSS EXAMINATION BY MR. FAKHOURY:       70
15       REDIRECT EXAMINATION BY MR. MILLER:      83
         RECROSS EXAMINATION BY MR. FAKHOURY:     84
16
```

17   **ARISTEO VASQUEZ-ROJAS**

```
18       DIRECT EXAMINATION BY MR. MILLER:        89
         CROSS EXAMINATION BY MR. FAKHOURY:       111
19       REDIRECT EXAMINATION BY MR. MILLER:      139

20
```

21   **MAURO RAMIREZ-JARQIN**

```
22       (VIDEOTAPED DEPOSITION PLAYED FOR JURY.)

23

24

25
```

1    **WITNESS:**

2    **CESAR CHAVEZ**

3        DIRECT EXAMINATION BY MR. PETERSON:        149
         CROSS EXAMINATION BY MR. MILLER:          153

4

5    **ARISTEO VASQUEZ-ROJAS**

6        (CONTINUED VIDEO DEPOSITION OF WITNESS.)

7

8                            **EXHIBITS**                      **ADM**

9

10   GOVERNMENT'S EXHIBIT NO. 1                    55

11   GOVERNMENT'S EXHIBIT NO. 2                    147

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              SAN DIEGO, CALIFORNIA; WEDNESDAY, NOVEMBER 17, 2010

 2                              - - -

 3                   (COURT IN SESSION AT 9:15 A.M.)

 4              MADAM CLERK:  CASE NO. 10CR1372, UNITED STATES OF

 5     AMERICA VERSUS JONATHAN LEAL-DEL CARMEN.

 6              MR. MILLER:  STEVE MILLER FOR THE UNITED STATES.

 7              MR. FAKHOURY:  HANNI FAKHOURY AND DAVID PETERSON

 8     FOR MR. LEAL.  HE IS PRESENT IN COURT, BEING ASSISTED BY THE

 9     COURT CERTIFIED INTERPRETER.

10              THE COURT:  WE ARE PRESENT OUTSIDE THE PRESENCE OF

11     THE JURY FOR TWO REASONS.  FIRST, MOST SIGNIFICANTLY, THE

12     DEFENSE HAD SUBPOENAED THE CO-DEFENDANT IN THIS CASE WHO IT

13     IS MY UNDERSTANDING IS UNAVAILABLE BECAUSE HE IS GOING TO

14     ASSERT HIS FIFTH AMENDMENT RIGHTS AND MR. FAKHOURY WANTED TO

15     MAKE A RECORD IN THAT REGARD.

16              MR. FAKHOURY:  YES, YOUR HONOR, JUST BRIEFLY.  WE

17     DID SUBPOENA MR. GOMEZ-AGUILAR.  WE SPOKE WITH MR. CARRIEDO,

18     HIS ATTORNEY, AND HE INFORMED US IF HE WERE TO BE CALLED AS A

19     WITNESS HE WOULD INVOKE HIS FIFTH AMENDMENT RIGHT TO REMAIN

20     SILENT.  I SPOKE WITH MR. CARRIEDO ON MONDAY, LEFT HIM A

21     MESSAGE CONFIRMING THAT.  I HAVEN'T HEARD BACK FROM HIM.

22     EVERY TIME I HAD SPOKEN WITH HIM ABOUT THE SITUATION,

23     MR. CARRIEDO SAID MR. GOMEZ-AGUILAR WOULD INVOKE.

24              SO, I THINK, AT THIS POINT, THE PARTIES ARE IN

25     AGREEMENT THAT HE IS LEGALLY UNAVAILABLE IN THE SENSE THAT IF
```

1   HE WERE TO TESTIFY, HE WOULD INVOKE HIS RIGHT TO REMAIN

2   SILENT.  AND SPECIFICALLY UNDER 804 OF THE FEDERAL RULES OF

3   EVIDENCE, I THINK THE PARTIES AGREE THAT HE IS UNAVAILABLE,

4   AND THAT'S THE STIPULATION THAT DOESN'T PREJUDICE ANY OTHER

5   LEGAL POINTS JUST THAT WE AGREE HE IS UNAVAILABLE.

6            THE COURT:  SO STIPULATED, MR. MILLER?

7            MR. MILLER:  YES.

8            THE COURT:  JUST SO THE RECORD IS CLEAR, MR. GOMEZ

9   PLEAD GUILTY, HE DOES HAVE OTHER CHARGES PENDING, IS THAT NOT

10  ACCURATE?

11           MR. MILLER:  PARDON?

12           THE COURT:  HE DOES HAVE OTHER CHARGES PENDING?  HE

13  DIDN'T PLEAD TO THE ENTIRE INDICTMENT?

14           MR. MILLER:  CORRECT.  HE PLEAD TO COUNT TWO AND

15  THEN THE DISMISSAL, THE CONTEMPLATED --

16           THE COURT:  THE CHARGES ARE STILL PENDING AS OF

17  THIS MOMENT.

18           MR. MILLER:  YES.

19           THE COURT:  I JUST WANTED TO PERFECT THE RECORD.

20           MR. FAKHOURY:  THAT'S FINE.

21           THE COURT:  THE SECOND THING THAT CAME UP WITH

22  REGARD TO THE PLAYING OF THE VIDEO, I NORMALLY WOULDN'T READ

23  THE STANDARD NINTH CIRCUIT -- AND I WILL READ THE STANDARD

24  NINTH CIRCUIT JURY INSTRUCTION WITH REGARD TO THE TRANSCRIPT

25  RECORDING MADE IN ENGLISH AS 2.7.  THE PARTIES HAVE JOINTLY

```
 1    REQUESTED THAT I AUGMENT THAT STANDARD INSTRUCTION BY TELLING
 2    THE JURORS AS FOLLOWS, "YOU WILL NOT BE ABLE TO VIEW THE
 3    VIDEO AFTER IT IS PLAYED DURING THIS TRIAL.  DURING THE
 4    VIEWING OF THE VIDEO, YOU MAY NOTICE THAT THERE ARE BLANK
 5    AREAS IN THE TRANSCRIPTS AND THERE WILL BE PORTIONS OF THE
 6    VIDEO THAT ARE NOT PLAYED.  DO NOT PLACE ANY SIGNIFICANCE
 7    UPON WHAT WAS REMOVED FROM THE VIDEO.  THE PARTIES AND THIS
 8    COURT HAVE DECIDED PORTIONS OF THE VIDEO ARE NOT RELEVANT TO
 9    THIS CASE AND SHOULD NOT BE CONSIDERED BY YOU FOR ANY
10    REASON."  THAT'S AN ACCURATE STATEMENT, THAT'S WHAT YOU
11    GENTLEMEN AGREED TO?
12              MR. FAKHOURY:  YES, YOUR HONOR.
13              MR. MILLER:  YES.
14              THE COURT:  ANYTHING FURTHER BEFORE WE RECESS FOR
15    THE JURY?
16              MR. MILLER:  NO.
17              THE COURT:  OKAY.  WE ARE IN RECESS.  THANK YOU.
18              MR. FAKHOURY:  THANK YOU, YOUR HONOR.
19                    (JURY ENTERS COURTROOM.)
20              THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.
21    THIS IS THE MATTER OF THE UNITED STATES VERSUS JONATHAN
22    LEAL-DEL CARMEN.  THE COURT FINDS COUNSEL ARE PRESENT,
23    MR. LEAL IS PRESENT, ALL MEMBERS OF THE JURY PANEL ARE
24    PRESENT.  MR. MILLER, YOU MAY PROCEED.
25              MR. MILLER:  THE UNITED STATES IS GOING TO CALL
```

1    AGENT PECHT.

2                        (WITNESS SWORN.)

3            THE COURT:  GOOD MORNING, SIR.  HOW ARE YOU?

4            THE WITNESS:  GOOD MORNING.  HOW ARE YOU?

5            THE COURT:  GOOD.

6            MADAM CLERK:  COULD YOU STATE YOUR NAME AND SPELL

7    YOUR LAST NAME, PLEASE?

8            THE WITNESS:  MY NAME IS BRIAN PECHT.  LAST NAME IS

9    SPELLED P-E-C-H-T.

10            MADAM CLERK:  COULD YOU SPELL YOUR FIRST NAME,

11   PLEASE?

12            THE WITNESS:  BRIAN IS B-R-I-A-N.

13                        **BRIAN PECHT**

14   CALLED AS A WITNESS HEREIN, HAVING BEEN FIRST DULY SWORN

15   WAS EXAMINED AND TESTIFIED AS FOLLOWS:

16                     **DIRECT EXAMINATION**

17   **BY MR. MILLER:**

18   Q.   WITH WHOM ARE YOU EMPLOYED?

19   A.   US BORDER PATROL.

20   Q.   WHAT IS YOUR POSITION WITH THE BORDER PATROL?

21   A.   BORDER PATROL AGENT.

22   Q.   HOW LONG HAVE YOU BEEN A BORDER PATROL AGENT?

23   A.   TWO-AND-A-HALF YEARS.

24   Q.   WERE YOU ON DUTY WITH THE BORDER PATROL ON MARCH 25,

25   2010?

1    A.   YES, SIR, I WAS.

2    Q.   ON THAT DAY WHAT WERE YOU DOING?

3    A.   I WAS PATROLLING AN AREA KNOWN AS ZONE 29.

4    Q.   NOW, I'M GOING TO SHOW YOU GOVERNMENT'S EXHIBIT 1 FOR

5    IDENTIFICATION.  DO YOU RECOGNIZE THIS?

6    A.   YES, SIR, I DO.

7    Q.   WHAT IS DEPICTED IN GOVERNMENT'S EXHIBIT 1 FOR

8    IDENTIFICATION?

9    A.   IT'S A MAP WITH ALL THE LANDMARKS THAT WE USE IN ZONE

10   29.

11   Q.   WHEN YOU SAY MAP, IT'S LIKE A SCHEMATIC OF THE ROADS AND

12   THE LANDMARKS?

13   A.   YES, SIR.

14   Q.   WOULD THIS ASSIST YOU IN YOUR TESTIMONY HERE TODAY?

15   A.   YES, SIR.

16            MR. MILLER:  I'D OFFER EXHIBIT 1.

17            THE COURT:  ANY OBJECTION?

18            MR. FAKHOURY:  NO, YOUR HONOR.

19            THE COURT:  RECEIVED.

20                 (GOVERNMENT'S EXHIBIT NO. 1

21                  ADMITTED INTO EVIDENCE.)

22            MR. MILLER:  MAY I PUBLISH, YOUR HONOR?

23            THE COURT:  YES.

24   BY MR. MILLER:

25   Q.   ESSENTIALLY, ON EXHIBIT 1, WHICH IS DISPLAYED UP ON THE

1   SCREEN, ARE THE LINES REPRESENTATIVE OF VARIOUS ROADS?

2   A.   YES, SIR.

3   Q.   I'M GOING TO ZOOM IN.  DO YOU RECOGNIZE THIS PORTION OF

4   EXHIBIT 1?

5   A.   YES, SIR.

6   Q.   WHAT'S DEPICTED IN THIS PORTION OF EXHIBIT 1?

7   A.   THAT'S THE AREA KNOWN AS SMITH CANYON.

8   Q.   AND WHAT'S AROUND SMITH CANYON?

9   A.   IT'S JUST A BIG CANYON.  THERE IS A PORTION OF THE AREA

10  WHERE THE ACTUAL BORDER FENCE ENDS, AND THERE IS NOTHING

11  BLOCKING THE BORDER THERE.

12  Q.   NOW, WHEN YOU SAY THE BORDER FENCE, IS THIS THE LINE

13  BETWEEN THE UNITED STATES AND MEXICO?

14  A.   YES, THAT'S CORRECT.

15  Q.   DEPICTED ON THIS EXHIBIT IS END OF A FENCE ON THE LEFT

16  AND END OF FENCE ON THE RIGHT.  WHAT KIND OF FENCES WAS UP

17  THERE BACK ON MARCH 25TH?

18  A.   IN THAT AREA THERE WAS NO FENCE, SIR.

19  Q.   I'M TALKING ABOUT THE FENCE --

20  A.   OH, IT'S BUILT OUT OF A SOME TYPE OF AIR LANDING MATT,

21  LIKE I'M NOT SURE WHAT THE EXACT MATERIAL IS.

22  Q.   BUT IT'S ABOUT -- HOW HIGH IS IT?

23  A.   IT'S ABOUT SIX TO EIGHT FEET HIGH.

24  Q.   APPROXIMATELY HOW MANY MILES ALONG THE BORDER DOES ZONE

25  29 --

1    A.   I'D SAY IT'S ABOUT FOUR MILES.

2    Q.   AND IN THE AREA SMITH CANYON, WHAT IS BETWEEN THE US/

3    MEXICAN BORDER?

4    A.   NOTHING, JUST -- IT'S OPEN.

5    Q.   ALL RIGHT.  NOW, WHILE YOU PATROL THIS ZONE 29, HOW DO

6    YOU CUSTOMARILY PATROL IT?

7    A.   I NORMALLY DRIVE THE DIRT ROADS, AND I LOOK AT THE

8    GROUND, THE DIRT TO SEE IF THERE IS ANY TYPE OF DISRUPTION OR

9    SOMETHING THAT WOULD MAKE THE DIRT LOOK SUSPICIOUS, AND I

10   LOOK FOR SIGNS OF ILLEGAL CROSSINGS.

11   Q.   ALL RIGHT.  NOW, THE DIRT ROAD THAT YOU ARE A TALKING

12   ABOUT, THAT IS DEPICTED ON THE ZIGZAG LINES ON EXHIBIT 1?

13   A.   YES, SIR, IT IS.

14   Q.   LIKE THIS AREA THAT LOOKS LIKES AN EKG READING?

15   A.   YES, SIR.

16   Q.   ALL RIGHT.  NOW, DOES THE BORDER PATROL DO ANYTHING WITH

17   REGARD TO THESE DIRT ROADS TO ASSIST YOU IN YOUR PATROL?

18   A.   YES, WE RUN DRAGS, WHICH ARE BASICALLY CHAINS THAT YOU

19   ATTACH TO THE BACK OF YOUR VEHICLE WITH TIRES THAT YOU DRAG

20   BEHIND YOU AS YOU ARE DRIVING SO IT SMOOTHS OUT THE DIRT.

21   Q.   IS THAT WHY IT'S CALLED THE DRAG ROAD?

22   A.   YES, SIR.

23   Q.   AFTER IT HAS BEEN DRAGGED, DOES THAT ASSIST YOU IN

24   DETERMINING WHETHER OR NOT ANYONE MIGHT HAVE CROSSED THAT

25   ROAD?

1    A.    YES, IT DOES.  IT MAKES IT A LOT EASIER FOR US TO SEE

2    ANY TYPE OF FOOTPRINTS OR WHATEVER THAT MAY CROSS THE ROAD

3    THERE.

4    Q.    NOW, ON MARCH 25TH, DID YOU OBSERVE ANY SIGN OR TRACE

5    ALONG THAT DIRT ROAD THAT SOMEONE MAY OR MAY NOT HAVE CROSSED

6    THIS ROAD?

7    A.    YES, I DID.  I WAS DRIVING ON THE EAST SIDE OF SMITH

8    CANYON THERE --

9          MR. MILLER:  MAY I ASK THE WITNESS TO STEP DOWN AND

10   POINT OUT ON THIS EXHIBIT WHERE HE WAS DRIVING ALONG?

11         THE COURT:  DO YOU WANT A LASER POINTER?  HE CAN

12   PROBABLY DO IT FROM THERE.

13         MR. MILLER:  I'LL ASK HIM TO DO IT.  THAT'S THE

14   LASER POINTER RIGHT THERE.  OKAY.

15         THE WITNESS:  I WAS DRIVING RIGHT AROUND IN THIS

16   AREA HERE (INDICATING), WHEN I CAME ACROSS A COUPLE

17   FOOTPRINTS AND WHAT APPEARED TO BE A BRUSH-OUT WHERE

18   SOMEBODY -- IT SEEMED LIKE SOMEBODY TRIED TO CLEAN UP THE

19   ROAD.

20   BY MR. MILLER:

21   Q.    AND THESE BRUSH-OUTS, ARE THESE THE THINGS YOU LOOK FOR

22   WHEN INVESTIGATING POSSIBLE CROSSINGS?

23   A.    YES, SIR.

24   Q.    NOW, AROUND WHAT TIME OF DAY DID YOU MAKE -- DID YOU

25   OBSERVE THIS?

1    A.   I WOULD SAY IT WAS AROUND MIDNIGHT OR 1:00 IN THE

2    MORNING, SOMEWHERE IN BETWEEN THERE.

3    Q.   AND WHEN YOU SAW THIS BRUSH-OUT ALONG THAT ROAD, WHAT

4    DID YOU DO?

5    A.   I CONTACTED AGENT GUIEB TO ASSIST ME.   NORMALLY WE LIKE

6    TO WORK IN PAIRS JUST FOR SAFETY ISSUES.

7    Q.   ALL RIGHT.   TO SET THE SCENE, WHAT KIND OF VEHICLE WERE

8    YOU DRIVING AT THIS TIME?

9    A.   I BELIEVE I WAS DRIVING A TAHOE.

10   Q.   WERE YOU ALONE OR WITH A PARTNER IN THE TAHOE?

11   A.   I WAS ALONE AT THIS TIME.

12   Q.   AND WHEN YOU SAID YOU CALLED FOR AGENT GUIEB, WAS HE --

13   HE WAS ELSEWHERE?

14   A.   YES, SIR.

15   Q.   AND DO YOU RECOGNIZE AGENT GUIEB IN COURT TODAY?

16   A.   YES, I DO.

17   Q.   IS HE --

18   A.   HE IS SITTING RIGHT THERE (INDICATING).

19   Q.   ALL RIGHT.   AND WHEN YOU CALLED OUT FOR AGENT GUIEB, HOW

20   LONG UNTIL HE ARRIVED AT THE SCENE?

21   A.   ABOUT FIVE MINUTES.

22   Q.   ONCE HE ARRIVED AT THE SCENE, WHAT DID YOU TWO DO?

23   A.   WE PARKED OUR VEHICLES AND CONTINUED TO THE GATE, THE

24   SIGN THAT I HAD ENCOUNTERED.

25   Q.   YOU SAY SIGN, WHAT DO YOU MEAN WHEN YOU SAY SIGN?

1    A.   SIGN IS ANYTHING THAT WOULD -- TRACKS, FOOTPRINTS.  FOR

2    INSTANCE, THE BRUSH-OUT I MENTIONED EARLIER, BROKEN BRANCHES

3    COULD BE A FORM OF A SIGN, ANYTHING INDICATING SOMETHING

4    CROSSED IN THAT AREA OR CAME THROUGH THERE.

5    Q.   SO, AFTER YOU AND AGENT GUIEB ARRIVED IN THE AREA, WHAT

6    DID YOU DO?

7    A.   WE PARKED OUR VEHICLES, GOT OUT ON FOOT, CONTINUED TO

8    INVESTIGATE THE SIGN I CAME ACROSS AND EVENTUALLY STARTED

9    TRACKING IT NORTH/NORTHEAST.

10   Q.   NOW, WHAT WAS THE SIGN OR TRACES THAT YOU FOUND NEAR IN

11   THE BRUSH-OUT?

12   A.   THERE WAS FOOTPRINTS.  ONCE WE GOT OFF THE ROAD ONTO A

13   TRAIL, THERE WAS A SIGNIFICANT AMOUNT OF FOOTPRINTS.

14   Q.   WERE YOU ABLE TO TELL ON THIS OCCASION WHETHER OR NOT

15   THEY WERE FRESH FOOTPRINTS OR OLD FOOTPRINTS?

16   A.   YES, THEY LOOKED REAL FRESH.

17   Q.   HOW CAN YOU TELL?

18   A.   JUST BASED ON THE COLOR OF THE DIRT, THE TEXTURE OF IT,

19   IF YOU TOUCH IT, IF IT'S SOFT, IF IT SEEMS REAL HARD LIKE

20   IT'S BEEN SITTING THERE FOR A WHILE, IF THERE IS DEBRIS ON

21   TOP OF THE FOOTPRINTS.

22   Q.   HOW FAR AWAY FROM THE DRAG ROAD DID YOU COME ACROSS

23   THESE FOOTPRINTS?

24   A.   UM, NOT FAR AT ALL, ALMOST RIGHT THERE.  ONCE WE GOT OFF

25   THE ROAD, IT SEEMED LIKE THEY ONLY ATTEMPTED TO COVER UP THE

1   CROSSING ON THE ROAD.  AND ONCE WE GOT ONTO THE TRAIL THERE

2   IT WAS PRETTY EVIDENT.

3   Q.   DID YOU FOLLOW THE FOOTPRINTS?

4   A.   YES, SIR, WE DID.

5   Q.   HOW FAR DID YOU FOLLOW THEM?

6   A.   I WOULD SAY ABOUT A COUPLE HUNDRED YARDS, 200 YARDS.

7   Q.   AND WOULD YOU HAVE AN ESTIMATE OF HOW FAR YOU TRACKED

8   THOSE FOOTPRINTS -- ESTIMATE ON EXHIBIT 1?

9   A.   DO YOU WANT ME TO POINT --

10  Q.   YES, PLEASE.

11  A.   IT WAS PROBABLY RIGHT IN THAT AREA THERE (INDICATING).

12  Q.   ALL RIGHT.  NOW, IN THAT AREA THAT APPEARS TO BE JUST

13  NORTHWEST OF A PLACE MARKED 146?

14  A.   YES, SIR.

15  Q.   ON THIS EXHIBIT, WHAT DOES THE 146 --

16  A.   THAT IS AN SDG&E POWER TOWER.  THE SDG&E POWER TOWERS

17  ARE NUMBERED AND THAT ONE IS JUST NUMBERED 146.

18  Q.   IS THAT A LANDMARK THAT YOU USE --

19  A.   YES, SIR.

20  Q    -- WHEN IDENTIFYING YOUR LOCATION?

21  A.   YES, SIR, IT IS.

22  Q.   AND ALSO ON EXHIBIT 1, IS 143, 144, OTHER ONES MARKED,

23  ARE THERE POWER LINES STRUNG BETWEEN THOSE AREAS -- THESE

24  MARKS?

25  A.   YES, SIR.

1   Q.   NOW, WHEN YOU FOLLOWED THE FOOTPRINTS, DID YOU COME TO

2   AN END?

3   A.   YES.

4   Q.   AND WHAT DID YOU SEE WHEN YOU CAME TO AN END?

5   A.   WE CAME TO A SPOT WHERE WE NO LONGER HAD ANY TRACKS OR

6   ANY FORM OR SIGNS.  SO, WE SEARCHED THE IMMEDIATE AREA AND

7   THAT'S WHEN AGENT --

8   Q.   BEFORE YOU GET INTO THAT.  WHEN YOU FOUND THESE

9   FOOTPRINTS, WERE YOU ABLE TO TELL BY THE NUMBER OF THEM ABOUT

10  HOW LARGE A GROUP THIS MIGHT BE?

11  A.   INITIALLY WE THOUGHT IT WOULD BE SIX TO EIGHT.  AT THIS

12  POINT, WE COULD ONLY ESTIMATE.

13  Q.   SO, WHEN THE FOOTPRINTS ON THE TRAIL STOPPED, THEN WHAT

14  DID YOU DO?

15  A.   WE SEARCHED THE AREA THERE THINKING THAT THE GROUP WAS

16  CLOSE OR MAYBE HIDING SOMEWHERE.  SO, ONCE THE SIGN AND THE

17  TRACKS STOPPED, THAT'S WHEN WE SEARCHED THE IMMEDIATE AREA

18  AND AGENT GUIEB CAME ACROSS THE GROUP.

19  Q.   DID YOU GO TO WHERE THE GROUP WAS?

20  A.   YES, SIR, I DID.

21  Q.   WHERE WAS IT?

22  A.   THEY WERE HIDING LAYING IN A BUSH REAL TIGHT TOGETHER.

23  Q.   APPROXIMATELY HOW MANY METERS AWAY FROM WHERE THE

24  FOOTPRINTS ENDED WAS THIS BUSH?

25  A.   ABOUT 10 TO 20 METERS OR SO.

1    Q.    CLOSE ENOUGH TO THROW A ROCK?

2    A.    YES, SIR.

3    Q.    AND HOW MANY PEOPLE DID YOU AND AGENT GUIEB FIND IN

4    THIS --

5    A.    TWELVE.

6    Q.    WHEN YOU CAME ACROSS THESE PEOPLE, DID YOU APPREHEND

7    THEM?

8    A.    YES, SIR.

9    Q.    AND WHEN YOU APPREHENDED THEM, WHAT DID YOU DO WITH

10   THEM?

11   A.    WE FIRST SECURED THEM.

12   Q.    AND WHEN YOU SAY SECURE THEM, WHAT DO YOU MEAN?

13   A.    WE HAVE PLASTIC TIES -- WE SEARCH THEM.  THEN WE SECURED

14   THEM WITH PLASTIC TIES, AND WE LINED THEM UP AND WE STARTED

15   TO WALK THEM OUT TOWARDS THE ROAD WHERE WE INITIALLY GOT ON

16   THE SIGN THERE.

17   Q.    AND WHAT DID YOU DO ONCE YOU TOOK THE 12 PEOPLE BACK TO

18   THE ROAD?

19   A.    WE CALLED FOR TRANSPORT TO COME WITH THE VAN TO

20   TRANSPORT THE BODIES.  AS WE WERE WAITING, WE SAT THEM DOWN,

21   DETERMINED THEIR CITIZENSHIP, ASKED THEM A COUPLE QUESTIONS

22   AND BASICALLY WAITED FOR THE TRANSPORT TO ARRIVE.

23   Q.    HOW LONG BEFORE THE TRANSPORT ARRIVED?

24   A.    ABOUT 10, 15 MINUTES OR SO.

25   Q.    AND DID THE TRANSPORT TAKE THE 12 PEOPLE AWAY FROM THE

1    AREA?

2    A.   YES, SIR.

3    Q.   AFTER THE 12 PEOPLE WERE TAKEN AWAY AND TRANSPORTED,

4    WHAT DID YOU AND AGENT GUIEB DO?

5    A.   WE WENT BACK TO THE AREA WHERE WE APPREHENDED THE GROUP

6    OF 12 TO SEARCH, DO AN AREA SEARCH TO SEE IF THERE WERE ANY

7    OTHER PEOPLE OUTSTANDING.

8    Q.   WHY DID YOU DO THIS?

9    A.   THIS IS SOMETHING WE DO.  LIKE I SAID, WE THOUGHT IT WAS

10   SIX TO EIGHT EARLIER.  WE CAN ONLY ESTIMATE HOW MANY -- HOW

11   BIG THE GROUP WAS GOING TO BE.  SO, WE DO THAT JUST TO SEE IF

12   THERE IS ANY OTHER PEOPLE THAT WE COULD FIND.

13   Q.   WHEN YOU WENT BACK TO THE AREA, DID YOU FIND ANYTHING?

14   A.   YES, WE CAME ACROSS TWO SETS OF TRACKS.

15   Q.   AND APPROXIMATELY HOW MANY METERS AWAY FROM THE TREE

16   WHERE YOU FOUND THE GROUP WERE THESE OTHER TWO SETS OF

17   PRINTS?

18   A.   TEN METERS OR SO.

19   Q.   WHEN YOU FOUND THESE TWO SETS OF TRACKS -- WHEN YOU SAY

20   TRACKS, YOU MEAN FOOTPRINTS?

21   A.   FOOTPRINTS, YES, SIR

22   Q.   WHEN YOU SAY FOOTPRINTS, WE DON'T MEAN BEAR FOOTPRINTS

23   BUT SHOE PRINTS?

24   A.   YES, SIR.

25   Q.   WHAT DID YOU DO WHEN YOU FOUND THESE TWO SETS OF

1   FOOTPRINTS?

2   A.   WE ATTEMPTED TO FOLLOW THE FOOTPRINTS AND EVENTUALLY --

3   WE WERE GETTING NO WHERE WITH IT.  WE LOST THE SIGN AND

4   CONTINUED ON WITH OUR PATROLLING DUTIES.

5   Q.   THE TWO SETS OF FOOTPRINTS THAT YOU FOUND, WERE YOU ABLE

6   TO DISTINGUISH THOSE FOOTPRINTS FROM EACH OTHER?

7   A.   YES.

8   Q.   NOW, WHEN YOU FIRST CAUGHT THE FOOTPRINTS JUST NORTH OF

9   THE TRAIL AND SAW THAT IT WAS A GROUP, DID YOU NOTICE ANY

10  DISTINGUISHING MARKS WHERE YOU COULD SEPARATE THE FOOTPRINTS

11  THAT YOU FOUND NEAR THE AREA WITH THE TWO SETS AMONG THE

12  GROUP OF SIX TO EIGHT THAT YOU THOUGHT THAT YOU HAD?

13  A.   YES.

14  Q.   AND HOW LONG DID YOU TRY AND TRACK THESE OTHER TWO

15  FOOTPRINTS?

16  A.   ABOUT 30 MINUTES TO AN HOUR.

17  Q.   AFTER THAT YOU GAVE UP AND WENT BACK TO PATROLLING?

18  A.   YES, SIR.

19  Q.   AND WHEN YOU SAY GO BACK TO PATROLLING, WHAT DOES THAT

20  MEAN?

21  A.   BASICALLY DRIVING THE ROADS, JUST LIKE I WAS DOING

22  EARLIER, LOOKING FOR ANY TYPE OF ILLEGAL CROSSINGS.

23  RESPONDING TO SENSORS OR JUST BASIC PATROLLING DUTIES.

24  Q.   NOW, AT SOME POINT LATER ON MARCH 25TH, WAS YOUR

25  ATTENTION DRAWN TO ACTIVITY NEAR AN AREA NICKNAMED THE CHURCH

1    OF GOD?

2    A.   YES, SIR.

3    Q.   AND IS THAT DEPICTED IN EXHIBIT 1 FOR IDENTIFICATION?

4    A.   YES, IT IS.

5    Q.   WOULD YOU PLEASE USE THE LASER POINTER TO POINT THAT

6    OUT.  WHAT IS AROUND THE CHURCH OF GOD?

7    A.   CHURCH OF GOD IS BASICALLY A RELIGIOUS RETREAT.  IT'S A

8    PROPERTY.  BIG, BIG PROPERTY.  JUST A BUNCH OF BRUSH, COUPLE

9    BUILDINGS.

10   Q.   NOW, WHAT WERE YOU DOING WHEN YOUR ATTENTION WAS

11   DIRECTED TO THE CHURCH OF GOD?

12   A.   I WAS DIRECTLY SOUTH ON WHAT'S CALLED THE G ROAD.  IT'S

13   A ROAD THAT HAS ALL THE SDG&E TOWERS ON AND I WAS BASICALLY

14   LOOKING FOR A SIGN ON THAT ROAD THERE.

15   Q.   AND IS THAT ROAD DEPICTED?

16   A.   YES, SIR.

17   Q.   WOULD YOU POINT IT OUT?

18   A.   THIS ROAD RIGHT HERE (INDICATING).  I WAS JUST EAST OF

19   THE 146 TOWER.

20   Q.   AROUND WHAT TIME WAS YOUR ATTENTION DRAWN TO THE CHURCH

21   OF GOD?

22   A.   I WOULD SAY 4:00, 5:00 IN THE MORNING.

23   Q.   ABOUT HOW MANY HOURS WOULD THAT HAVE BEEN AFTER YOU HAD

24   LOST THE TWO -- THE TRAIL OF THE TWO FOOTPRINTS?

25   A.   ABOUT THREE, THREE OR FOUR HOURS.

1    Q.   AND HOW WAS YOUR ATTENTION DRAWN TO THE CHURCH OF GOD

2    AREA?

3    A.   A SCOPE OPERATOR HAD SEEN TWO INDIVIDUALS WALKING

4    NORTHBOUND IN THE CHURCH OF GOD AND ASKED IF AGENTS COULD

5    RESPOND.

6    Q.   WHEN YOU RECEIVED THAT RADIO CALL, WHAT DID YOU DO?

7    A.   I PARKED MY VEHICLE ON THE G ROAD THERE.  I ALSO CALLED

8    AGENT GUIEB AS WELL, AGAIN, TO GIVE ME A HAND.

9    Q.   WHY DID YOU CALL AGENT GUIEB?

10   A.   HE WAS ASSIGNED IN THE SAME ZONE, SO I KNEW HE COULD

11   RESPOND QUICK.

12   Q.   ALL RIGHT.  SO, WHEN YOU CALLED AGENT GUIEB, IT WAS

13   BECAUSE HE WAS THERE.  IT WASN'T BECAUSE ANYTHING THAT

14   HAPPENED THREE HOURS EARLIER?

15   A.   NO, SIR.

16   Q.   HOW LONG DID IT TAKE FOR AGENT GUIEB TO ARRIVE?

17   A.   ABOUT FIVE MINUTES.

18   Q.   WHAT DID YOU DO AFTER AGENT GUIEB ARRIVED?

19   A.   WE PARKED OUR VEHICLE AND WE TALKED ABOUT THE QUICKEST

20   WAY TO GET UP THERE.  SO, WE PARKED OUR VEHICLE ON THE G ROAD

21   THERE AND WE BASICALLY JUST WALKED STRAIGHT NORTH IN THE

22   BOTTOM OF THE CANYON.  WE TOOK THIS PATH HERE (INDICATING).

23   IF YOU WALK STRAIGHT NORTH, THERE IS A CANYON THAT CONNECTS

24   TO THE CHURCH OF GOD.  SO, WE PARKED HERE AND WE JUST RAN

25   STRAIGHT NORTH THERE (INDICATING).

1    Q.   WHILE TRAVELING FROM THE G ROAD TOWARD THE CHURCH OF

2    GOD, DID YOU PICK UP ANY SIGN?

3    A.   YES, SIR, WE DID.

4    Q.   WHAT DID YOU FIND?

5    A.   WE PICKED UP THE SAME SIGN THAT WE HAD SEEN, THE TWO --

6    THE PAIR THAT WE HAD SEEN EARLIER THAT WAS CLOSE TO THE GROUP

7    OF 12.

8    Q.   SO, YOU RECOGNIZED THOSE FOOTPRINTS AS WHAT YOU HAD SEEN

9    THREE HOURS BEFORE?

10   A.   YES, SIR.

11   Q.   AND THEN WHAT DID YOU DO WHEN YOU FOUND THOSE

12   FOOTPRINTS?

13   A.   WE JUST CONTINUED TO THE CHURCH OF GOD AREA, AND WE

14   ASKED THE SCOPE OPERATOR IF HE COULD PUT US IN ON THE LAST

15   SPOT HE HAD SEEN THE TWO INDIVIDUALS.

16   Q.   WERE YOU DIRECTED TO ANY PARTICULAR PLACE?

17   A.   YES.

18   Q.   AND WHAT WAS IN THAT PLACE?

19   A.   WE CAME UP ON A DIRT ROAD THAT WAS INSIDE THE CHURCH OF

20   GOD COMPLEX, THE RETREAT THERE, AND TO THE EAST OF US THERE

21   WAS A HILLSIDE WHERE WE WERE DIRECTED UP TO GO UP THERE

22   BECAUSE THAT'S WHERE THE SCOPE OPERATOR SAID HE HAD LAST SEEN

23   THE TWO INDIVIDUALS.  AND UPON SEARCH OF THE AREA, AGENT

24   GUIEB CAME ACROSS MORE TRACKS, I BELIEVE, AND EVENTUALLY

25   FOUND THE TWO INDIVIDUALS.

```
 1   Q.   AND WHEN YOU SAW THE TWO INDIVIDUALS, WHERE WERE THEY?

 2   A.   THEY WERE LAYING DOWN INSIDE A BUSH.

 3   Q.   DID YOU MAKE CONTACT WITH THESE PEOPLE?

 4   A.   YES, SIR.

 5   Q.   HOW DID YOU MAKE CONTACT WITH THEM?

 6   A.   WE TOLD THEM "US BORDER PATROL", FIRST OFF, GET THEM

 7   SECURED, AND THEN WE WALKED THEM OUT TO THE COMPLEX INSIDE

 8   CHURCH OF GOD.

 9   Q.   WHEN YOU MADE CONTACT, HOW MANY PEOPLE WERE THERE?

10   A.   TWO.

11   Q.   DID YOU MAKE A COMPARISON WITH THEIR SHOES WITH THE

12   TRACKS THAT YOU HAD SEEN?

13   A.   YES.

14   Q.   AND HOW DID THEY COMPARE?

15   A.   THEY WERE THE FOOTPRINTS THAT WE HAD SEEN.

16   Q.   IS ONE OF THE INDIVIDUALS THAT YOU LOCATED -- LOCATED IN

17   THE CHURCH OF GOD AREA, IN COURT TODAY?

18   A.   YES, HE IS.

19   Q.   WOULD YOU POINT HIM OUT AND STATE WHAT HE IS WEARING?

20   A.   HE IS RIGHT THERE WITH THE MUSTACHE WEARING THE GRAY

21   COLOR SHIRT.

22            MR. MILLER:  MAY THE RECORD REFLECT HE HAS SO

23   IDENTIFIED THE DEFENDANT?

24            THE COURT:  IT MAY SO REFLECT.

25
```

1    BY MR. MILLER:

2    Q.   AFTER YOU HAD CONTACT WITH THESE INDIVIDUALS, WHEN YOU

3    APPREHENDED THEM --

4    A.   YES.

5    Q    -- DID YOU OR AGENT GUIEB TRANSPORT THEM OR CALL FOR

6    TRANSPORT?

7    A.   CALLED FOR TRANSPORT.

8    Q.   AND AFTER THEY WERE TRANSPORTED AWAY, DID YOU HAVE ANY

9    OTHER CONTACT WITH THE DEFENDANT OR THIS OTHER PERSON?

10   A.   NO, SIR.

11              MR. MILLER:  NO FURTHER QUESTIONS, YOUR HONOR.

12              THE COURT:  CROSS EXAMINATION?

13                        **CROSS EXAMINATION**

14   **BY MR. FAKHOURY:**

15   Q.   GOOD MORNING, AGENT PECHT.  AM I SAYING THAT RIGHT, SIR?

16   A.   PECHT.

17   Q.   I APOLOGIZE.  YOUR INVESTIGATION OF THIS CASE ENDED ON

18   MARCH 5, 2010, IS THAT CORRECT?

19   A.   YES, SIR.

20   Q.   DID YOU WRITE A REPORT IN THIS CASE?

21   A.   NO, SIR, I DID NOT.

22   Q.   DID YOU REVIEW ANY REPORTS BEFORE YOU TESTIFIED HERE

23   THIS MORNING?

24   A.   YES.

25   Q.   WHICH REPORT WAS THAT?

1   A.   IT WAS A REPORT DONE BY, I BELIEVE, AGENT THOMAS

2   MESSIAHS, I BELIEVE.

3   Q.   DID YOU REVIEW ANY OTHER REPORTS?

4   A.   NO, I DID NOT.

5   Q.   ALL RIGHT.  I'M GOING TO TRY TO USE THIS ELMO HERE.

6   HOPEFULLY I CAN GET IT RIGHT.  I WANTED TO ASK YOU A COUPLE

7   QUESTIONS ABOUT THIS MAP.  YOU TESTIFIED THAT THE FENCE HERE

8   (INDICATING), THIS IS THE BORDER FENCE, IS THAT RIGHT?

9   A.   YES, THAT'S CORRECT.

10   Q.   SO, EVERYTHING SOUTH OF THE FENCE IS MEXICO, CORRECT?

11   A.   YES.

12   Q.   AND EVERYTHING NORTH OF THE FENCE IS THE UNITED STATES,

13   CORRECT?

14   A.   YES, THAT'S CORRECT, SIR.

15   Q.   NOW, I WANT TO START BY TALKING ABOUT THIS AREA CALLED

16   SMITH CANYON.  NOW, YOU TESTIFIED THAT YOU FOUND THIS GROUP

17   OF 12 PEOPLE RIGHT AROUND HERE (INDICATING), IS THAT CORRECT?

18   A.   RIGHT AROUND THERE (INDICATING), SIR.

19   Q.   RIGHT BY THE MARKER THAT SAYS 146?

20   A.   A LITTLE NORTHWEST, YES.

21   Q.   OKAY.  THAT'S ABOUT 200 YARDS NORTH OF THE BORDER?

22   A.   IT'S PROBABLY ABOUT 200 YARDS NORTH OF THE TOWER THERE.

23   Q.   THE SDG --

24   A.   THE 146.

25   Q.   -- TOWER?

1    A.   YES.

2    Q.   OKAY.  NOW, YOU TESTIFIED THIS AREA HERE THERE IS PRETTY

3    MUCH NOTHING HERE, RIGHT?

4    A.   IT'S JUST A BIG RIDGE.

5    Q.   AND JUST FOR THE RECORD, I WAS REFERRING TO THE AREA

6    BETWEEN SMITH CANYON AND NO. 146.  YOU TESTIFIED THAT THAT'S

7    JUST A BIG RIDGE, YOU SAID, RIGHT?

8    A.   YES, SIR.

9    Q.   SO, THERE IS NO HOUSES THERE?

10   A.   NO, SIR.

11   Q.   NO STREET LIGHTS?

12   A.   NO, SIR.

13   Q.   NO BUSINESSES OR RESTAURANTS?

14   A.   NO, SIR.

15   Q.   THERE IS PRETTY MUCH NOTHING THERE?

16   A.   THAT'S CORRECT, SIR.

17   Q.   AND YOU ALSO TESTIFIED THAT IT WAS APPROXIMATELY

18   MIDNIGHT OR 1:00 IN THE MORNING --

19   A.   YES, SIR.

20   Q    -- WHEN YOU STARTED YOUR EXAMINING OR FOLLOWING THE

21   FOOTPRINTS WITH AGENT GUIEB, IS THAT RIGHT?

22   A.   YES, SIR, THAT'S CORRECT.

23   Q.   AND I BELIEVE YOU SAID IT TOOK ABOUT 30 MINUTES UNTIL

24   YOU FOUND THE GROUP OF 12 PEOPLE, IS THAT RIGHT?

25   A.   YES, SIR, THAT'S CORRECT.

1    Q.   AND THEN, YOU ULTIMATELY, AS YOU JUST SAID, YOU FOUND 12

2    PEOPLE, RIGHT?

3    A.   YES, SIR.

4    Q.   AND AS YOU SAID, YOU AND AGENT GUIEB FOUND THESE 12

5    PEOPLE, RIGHT?

6    A.   YES, SIR.

7    Q.   THERE WERE NO OTHER PEOPLE THERE ASSISTING YOU?

8    A.   NO, SIR.

9    Q.   AT THAT POINT, YOU ALREADY SUSPECTED THESE PEOPLE WERE

10   IN THE UNITED STATES ILLEGALLY, RIGHT?

11   A.   YES, SIR.

12   Q.   YOU WERE SPECIFICALLY LOOKING FOR PEOPLE WHO ILLEGALLY

13   ENTERED THE UNITED STATES, RIGHT?

14   A.   THAT'S CORRECT.

15   Q.   AND YOU ULTIMATELY DETERMINED NONE OF THESE PEOPLE HAD

16   LEGAL PERMISSION TO ENTER THE UNITED STATES?

17   A.   YES, SIR, THAT'S CORRECT.

18   Q.   NOW, YOU TESTIFIED THAT YOU FOLLOWED THE TRAIL OR I'M

19   PROBABLY NOT USING THE RIGHT WORD, BUT BASICALLY AFTER YOU

20   HAD SECURED THE 12 PEOPLE YOU WENT BACK TO THE AREA WHERE

21   THEY HAD BEEN FOUND, IS THAT RIGHT?

22   A.   YES, SIR.

23   Q.   YOU SAID FOR 30 MINUTES TO AN HOUR YOU AND AGENT GUIEB

24   INSPECTED THAT AREA, IS THAT RIGHT?

25   A.   THAT'S CORRECT.

1    Q.   AND SPECIFICALLY LOOKING TO SEE IF THERE IS ANYBODY ELSE

2    THERE, RIGHT?

3    A.   THAT'S CORRECT.

4    Q.   YOU ULTIMATELY FOUND OTHER FOOTPRINTS, RIGHT?

5    A.   YES, SIR.

6    Q.   AND YOU FOLLOWED THEM AND ULTIMATELY WEREN'T ABLE TO

7    FIND ANYTHING, IS THAT RIGHT?

8    A.   THAT'S CORRECT.

9    Q.   WHEN YOU WERE FOLLOWING THE FOOTPRINTS, HOWEVER, YOU

10   NOTICED THEY WERE GOING NORTH, IS THAT RIGHT?

11   A.   YES, SIR.

12   Q.   SO, THEY WERE GOING FROM THIS MARKER THAT'S 146, THEY

13   WERE GOING UP THIS WAY TOWARDS SMITH CANYON, IS THAT RIGHT,

14   TOWARDS THE AREA MARKED AS SMITH CANYON?

15   A.   WELL, IT WAS KIND OF HARD TO GET A DIRECTION OF TRAVEL

16   FOR THE TWO.  LIKE I SAID, WE COULDN'T GET IT GOING.  IN THAT

17   AREA THERE IT'S REALLY HARD TO TRACK AT TIMES BECAUSE THERE

18   IS A LOT OF CAP ROCK AND DICK BRUSH, WHERE IT'S REAL HARD TO

19   SEE THE FOOTPRINTS AT TIMES.

20   Q.   OKAY.  FROM THE POINT AT 146 WHEN YOU WENT BACK, AFTER

21   THE GROUP HAD BEEN APPREHENDED, YOU WEREN'T LOOKING FOR ANY

22   FOOTPRINTS GOING SOUTH, RIGHT?

23   A.   WE WERE JUST LOOKING FOR ANY FOOTPRINTS IN GENERAL.  IT

24   REALLY DIDN'T MATTER WHAT DIRECTION.

25   Q.   LET ME ASK YOU, YOU DIDN'T SEE ANY FOOTPRINTS GOING

1    SOUTH, IS THAT RIGHT?

2    A.   NO, SIR, I DID NOT.

3    Q.   YOU DID SEE SOME FOOTPRINTS GOING NORTH?

4    A.   YES, SIR.

5    Q.   YOU FOLLOWED THEM AS BEST AS YOU COULD BUT ULTIMATELY

6    COULDN'T FIND ANY?

7    A.   THAT'S RIGHT.

8    Q.   NOW, AGAIN, WE TALKED DOWN BELOW HERE IS MEXICO, RIGHT?

9    A.   YES, SIR.

10   Q.   AND OBVIOUSLY YOU HAVE NO JURISDICTION IN MEXICO, IS

11   THAT RIGHT?

12   A.   THAT'S CORRECT.

13   Q.   IF SOMEONE WAS RUNNING SOUTH TOWARDS MEXICO, YOU

14   COULDN'T GO AFTER THEM AND CROSS THE INTERNATIONAL BORDER TO

15   ARREST THEM, IS THAT RIGHT?

16   A.   THAT'S RIGHT.

17   Q.   DURING THE 30 MINUTES THAT -- THE 30 MINUTES TO AN HOUR

18   THAT YOU AND AGENT GUIEB WERE CHECKING THE AREA NEAR SECTION

19   MARKER 146, YOU DIDN'T FIND ANY BLANKETS IN THE ROAD, DID

20   YOU?

21   A.   NO.

22   Q.   OR JACKETS?

23   A.   NO.

24   Q.   A RAKE?

25   A.   NO.

1   Q.   YOU DIDN'T FIND A CELL PHONE?

2   A.   NO, I DID NOT.

3   Q.   YOU DIDN'T FIND ANY FLASHLIGHTS?

4   A.   NO, SIR.

5   Q.   OTHER THAN THE FOOTPRINTS YOU PRETTY MUCH FOUND NOTHING,

6   RIGHT?

7   A.   THAT'S RIGHT.

8   Q.   OTHER THAN THE FOOTPRINTS YOU FOUND NOTHING?

9   A.   THAT'S CORRECT.

10   Q.   NOW, DURING THIS 30 MINUTES TO THE HOUR AFTER YOU

11   ARRESTED THESE TWO YOU TESTIFIED YOU FOUND FOOTPRINTS?

12   A.   THAT'S RIGHT.

13   Q.   YOU TESTIFIED YOU FOUND TWO DISTINCT FOOTPRINTS?

14   A.   YES, SIR.

15   Q.   WAS THERE ANY WAY FOR YOU TO TELL -- LET ME STRIKE THAT.

16        YOU COULDN'T TELL WHETHER ONE SET OF THE FOOTPRINTS

17   WAS FOLLOWING ANOTHER SET OF THE FOOTPRINTS, COULD YOU?

18   A.   I'M NOT SURE WHAT YOU MEAN.

19   Q.   THE FOOTPRINTS, WERE THEY SIDE-BY-SIDE OR ONE AFTER

20   ANOTHER?

21   A.   ONE AFTER ANOTHER.

22   Q.   OKAY.  I THINK YOU TESTIFIED ABOUT 4:00 OR 5:00 IN THE

23   MORNING YOU RECEIVED A CALL FROM THE SCOPE OPERATOR?

24   A.   YES, SIR.

25   Q.   AND THAT'S SOMEBODY WHO SITS WITH A PRETTY POWERFUL

1    TELESCOPE?

2    A.   THAT'S RIGHT.

3    Q.   KIND OF OBSERVING THE BORDER, IS THAT RIGHT?

4    A.   THAT'S CORRECT.

5    Q.   AND THEY INFORMED YOU THAT THEY HAD SEEN TWO PEOPLE

6    WALKING AND ASKED YOU TO RESPOND, IS THAT RIGHT?

7    A.   YES, SIR.

8    Q.   NOW, THE AREA THEY ASKED YOU TO RESPOND TO, YOU

9    TESTIFIED, WAS CALLED CHURCH OF GATE -- CHURCH OF GOD, IS

10   THAT RIGHT?

11   A.   THAT'S RIGHT.

12   Q.   AND THAT'S THIS PORTION HERE WHERE IT SAYS CHURCH OF GOD

13   GATE, IS THAT CORRECT?

14   A.   YES, SIR.

15   Q.   SO, THIS WAS PRETTY MUCH STRAIGHT NORTH OF WHERE YOU

16   APPREHENDED THIS LARGER GROUP OF 12 INDIVIDUALS, IS THAT

17   RIGHT?

18   A.   THAT'S CORRECT.

19   Q.   AND YOU AND AGENT GUIEB WERE STILL AROUND THIS AREA ON

20   THE G ROAD, IS THAT RIGHT?

21   A.   YES, SIR.

22   Q.   AND YOU DECIDED THE FASTEST WAY TO GET THERE WAS TO

23   WALK, IS THAT RIGHT?

24   A.   YES, SIR.

25   Q.   HOW LONG DID IT TAKE FOR YOU TO WALK FROM G ROAD TO THE

1    AREA YOU ULTIMATELY FOUND THESE TWO PEOPLE?

2    A.   ABOUT 30 TO 45 MINUTES.

3    Q.   OKAY.

4    A.   WE ACTUALLY RAN.

5    Q.   OKAY.  SO, YOU RAN THERE, TOOK ABOUT 30 TO 45 MINUTES

6    AND YOU ULTIMATELY FOUND TWO PEOPLE HIDING, IS THAT RIGHT?

7    A.   YES, SIR.

8    Q.   AND THAT'S WHERE YOU FOUND MR. LEAL, IS THAT RIGHT?

9    A.   YES, SIR.

10   Q.   AND YOU FOUND ANOTHER INDIVIDUAL THERE?

11   A.   YES, SIR.

12   Q.   AND THAT'S DOMINGO GOMEZ, IS THAT RIGHT?

13   A.   YES, SIR.

14   Q.   YOU KNOW THAT'S HIS NAME, RIGHT?

15   A.   YES, SIR.

16   Q.   AND YOU ARRESTED MR. LEAL, RIGHT?

17   A.   YES, SIR.

18   Q.   YOU TESTIFIED STANDARD PROCEDURE IS TO SECURE THE

19   INDIVIDUAL, IS THAT RIGHT?

20   A.   THAT'S CORRECT.

21   Q.   AND THAT INVOLVES SEARCHING SOMEONE?

22   A.   YES, SIR.

23   Q.   AND YOU SEARCHED MR. LEAL?

24   A.   YES.

25   Q.   YOU DIDN'T FIND A BLANKET ON HIM?

1    A.   NO, SIR.

2    Q.   YOU DIDN'T FIND A RAKE ON HIM?

3    A.   NO, SIR.

4    Q.   YOU DIDN'T FIND A CELL PHONE ON HIM?

5    A.   I DON'T REMEMBER ABOUT THE CELL PHONE.

6    Q.   OKAY.  YOU DIDN'T FIND A FLASHLIGHT?

7    A.   NO, SIR.  BASICALLY --

8    Q.   THAT'S OKAY.  IF I HAVE A QUESTION -- THANK YOU.

9    A.   OKAY.

10   Q.   SO, ON MARCH 25TH, YOU ARRESTED 14 PEOPLE, RIGHT?

11   A.   YES, SIR.

12   Q.   AND YOU KNOW THAT TWO WERE KEPT AS DEFENDANTS, RIGHT?

13   A.   YES, SIR.

14   Q.   AND YOU KNOW THAT THREE WERE KEPT AS WHAT WE CALL

15   MATERIAL WITNESSES?

16   A.   YES, SIR.

17   Q.   SO, THAT LEAVES NINE OTHER PEOPLE, RIGHT?

18   A.   YES, SIR.  THAT'S CORRECT.

19   Q.   AND THOSE NINE PEOPLE WERE SENT BACK TO MEXICO, IS THAT

20   RIGHT?

21   A.   I BELIEVE SO.

22   Q.   AND JUST KIND OF GOING BACK TO WHERE WE STARTED, YOU

23   TESTIFIED AFTER YOU HAD APPREHENDED MR. LEAL AND MR. GOMEZ

24   AND SENT THEM TO TRANSPORT, YOUR WORK IN THIS CASE WAS PRETTY

25   MUCH DONE, IS THAT RIGHT?

1    A.   THAT'S CORRECT.

2    Q.   SO, YOU NEVER QUESTIONED OR FURTHER INTERVIEWED ANY OF

3    THE 14 PEOPLE AT THE BORDER PATROL STATION, IS THAT RIGHT?

4    A.   NO, SIR, I DID NOT.

5    Q.   YOU REFERENCED AGENT MESSIAHS HAD WRITTEN A REPORT.  YOU

6    ARE AWARE AGENT MESSIAHS WAS THE CASE AGENT IN THIS CASE, IS

7    HE NOT?

8    A.   YES.

9    Q.   SO, YOU ARE AWARE HE SPOKE WITH THE THREE PEOPLE WHO

10   WERE KEPT AS MATERIAL WITNESSES?

11   A.   YES, SIR.

12   Q.   AND OBVIOUSLY YOUR INVESTIGATION HAD ENDED SO YOU

13   WEREN'T THERE WHEN AGENT MESSIAHS SPOKE TO THESE PEOPLE,

14   RIGHT?

15   A.   THAT'S CORRECT.  I WAS NOT PRESENT.

16   Q.   AND YOU KNOW THAT AGENT MESSIAHS DIDN'T SPEAK TO THE

17   NINE OTHER INDIVIDUALS APPREHENDED THAT DAY AS WELL, RIGHT?

18            MR. MILLER:  OBJECTION, SPECULATION.

19            THE COURT:  SUSTAINED.  YOU CAN ASK HIM IF HE

20   KNOWS.

21   BY MR. FAKHOURY:

22   Q.   DO YOU KNOW WHETHER MR. MESSIAHS SPOKE TO THE OTHER NINE

23   INDIVIDUALS ARRESTED THAT DAY?

24   A.   NO, I DO NOT.

25            MR. FAKHOURY:  CAN I HAVE A MINUTE, YOUR HONOR?

```
 1              THE COURT:  CERTAINLY.

 2              MR. FAKHOURY:  THANK YOU.

 3   BY MR. FAKHOURY:

 4   Q.   I JUST WANTED TO CLARIFY A LITTLE BIT OF THE TIMING.

 5   YOU SAID THAT YOUR DIRECTION WAS -- THE SCOPE OPERATOR GOT

 6   YOUR ATTENTION SOMETIME BETWEEN 4:00 AND 5:00 IN THE MORNING,

 7   IS THAT RIGHT?

 8   A.   YES, SIR.

 9   Q.   AND THEN, YOU ALSO TESTIFIED THAT YOU WALKED -- OR RAN,

10   I'M SORRY, FOR ABOUT 45 MINUTES TO GET TO THE CHURCH OF GOD

11   GATE, IS THAT RIGHT?

12   A.   YES, SIR.

13   Q.   OKAY.  SO, BY THE TIME YOU GOT TO THE GROUP, IT WAS

14   PROBABLY CLOSER -- I'M SORRY, BY THE TIME YOU GOT TO THE TWO

15   INDIVIDUALS, IT WAS CLOSER TO 6:00 OR 6:30 IN THE MORNING, IS

16   THAT RIGHT?

17   A.   I BELIEVE SO.  I DON'T RECALL EXACTLY THE TIME.

18   Q.   IT WASN'T --

19   A.   I REMEMBER IT BEING TOWARDS THE END OF SHIFT BECAUSE I

20   REMEMBER AS WE WERE RUNNING UP THE CANYON, IT WAS STILL DARK,

21   AND BY THE TIME WE SECURED THE TWO INDIVIDUALS, IT STARTED TO

22   GET DAYLIGHT.

23   Q.   WHAT WAS YOUR SHIFT ON MARCH 25TH?

24   A.   MIDNIGHT SHIFT, WHICH WAS, AT THAT TIME, I BELIEVE IT

25   WAS 10:00 TO 6:00.
```

1   Q.   SO, YOUR SHIFT WOULD HAVE ENDED RIGHT AROUND 6:00

2   O'CLOCK IN THE MORNING?

3   A.   THAT'S CORRECT.

4        MR. FAKHOURY:  I HAVE NOTHING FURTHER, THANK YOU.

5        THE COURT:  HOLD UP.  LADIES AND GENTLEMEN, I WAS

6   TOLD THIS MORNING THAT WE ARE GOING TO HAVE A FIRE DRILL AT

7   10:00 O'CLOCK.  NORMALLY THEY WOULDN'T GIVE ME ADVANCE NOTICE

8   OF THIS, BUT THEY DID BECAUSE I HAVE A JURY.  I DON'T WANT

9   YOU TO GET UPSET WHEN THE ALARMS GO OFF.  WE WILL TAKE A

10  RECESS, GET OUT OF THE BUILDING.  THESE THINGS USUALLY LAST

11  ABOUT A HALF HOUR, ROUGHLY.  I EXPECT YOU TO RE-ASSEMBLE BACK

12  HERE AT 10:30.  AGAIN, WHEN YOU HEAR THE SIRENS GO, DON'T BE

13  SCARED.  IT'S A DRILL.  AGAIN, YOU'RE LUCKY BECAUSE NORMALLY

14  THEY DON'T TELL ME, BUT BECAUSE I HAVE A JURY, IF THEY ARE

15  REAL OR NOT REAL.  THERE YOU GO.  SO, WE WILL RECESS UNTIL

16  APPROXIMATELY 10:30.

17                    (BRIEF INTERRUPTION.)

18                    (JURY ENTERS COURTROOM.)

19       THE COURT:  GOOD MORNING, AGAIN, LADIES AND

20  GENTLEMEN.  YOUR HAD YOUR EXCITEMENT FOR THE DAY.  THIS IS

21  THE MATTER OF THE UNITED STATES VERSUS JONATHAN LEAL-DEL

22  CARMEN.  THE COURT FINDS COUNSEL ARE PRESENT, MR. LEAL IS

23  PRESENT, ALL MEMBERS OF THE JURY PANEL ARE PRESENT.  AGENT

24  PECHT, YOU REMAIN ON THE WITNESS STAND AND YOU ARE STILL

25  UNDER OATH FROM BEFORE THE FIRE DRILL, OKAY?  MR. MILLER,

1    REDIRECT?

2                      **REDIRECT EXAMINATION**

3    **BY MR. MILLER:**

4    Q.   WHEN YOU FIRST STARTED TRACKING THE ORIGINAL GROUP'S

5    FOOTPRINTS, HOW DID YOU LIGHT YOUR WAY?

6    A.   USING A FLASHLIGHT.

7    Q.   WHEN YOU ARE TRACKING FOOTPRINTS THAT YOU THOUGHT MIGHT

8    BE RECENT, DO YOU TRY TO USE ANY STEALTH OR DO YOU JUST BREAK

9    THROUGH THE BRUSH AND TRY TO GET THERE AS QUICKLY AS

10   POSSIBLE?

11   A.   WE JUST TRY TO GET THERE AS QUICKLY AS POSSIBLE.

12   Q.   AND THEN, ONCE YOU GO LOOKING FOR THE GROUPS, DO YOU USE

13   A FLASHLIGHT TO TRY AND FIND THEM?

14   A.   YES, THAT'S CORRECT.

15   Q.   NOW, WHEN YOU GOT THE CALL THREE HOURS LATER OF FURTHER

16   ACTIVITY, WAS THE SUN STILL DOWN AT THAT TIME?

17   A.   YES, SIR.

18   Q.   AND WHEN YOU WENT FROM THE G ROAD UP TOWARD THE CHURCH

19   OF GOD, RUNNING, DID YOU USE FLASHLIGHTS DURING YOUR JOG UP

20   THAT AREA?

21   A.   YES, SIR, WE DID.

22   Q.   AND DID YOU HAVE ANY -- DO YOU KNOW WHETHER OR NOT YOU

23   STOPPED USING THE FLASHLIGHTS AT THAT PARTICULAR TIME?

24   A.   I DON'T RECALL.

25   Q.   WERE YOU USING FLASHLIGHTS WHEN YOU FOUND THE DEFENDANT

1    AND THE OTHER PERSON?

2    A.   I BELIEVE SO, YES.

3           MR. MILLER:  ALL RIGHT.  NO FURTHER QUESTIONS.

4           THE COURT:  RECROSS?

5           MR. FAKHOURY:  ONE MOMENT, YOUR HONOR.

6                    **RECROSS EXAMINATION**

7    **BY MR. FAKHOURY:**

8    Q.   YOU JUST TESTIFIED NOW THAT YOU USED A FLASHLIGHT TO

9    LIGHT THE WAY UP FROM G ROAD?

10          MR. MILLER:  HOLD ON.

11          MR. FAKHOURY:  THANK YOU.

12   BY MR. FAKHOURY:

13   Q.   YOU JUST TESTIFIED NOW THAT YOU USED A FLASHLIGHT AS YOU

14   WERE RUNNING UP FROM THE G ROAD TO CHURCH OF GOD, IS THAT

15   RIGHT?

16   A.   YES, THAT'S CORRECT.

17   Q.   AND YOU ALSO TESTIFIED EARLIER THAT YOU HAD REVIEWED A

18   REPORT WRITTEN BY AGENT MESSIAHS, IS THAT CORRECT?

19   A.   YES, SIR.

20   Q.   AND YOU ALSO TESTIFIED THAT HE WAS THE CASE AGENT IN

21   THIS CASE, IS THAT RIGHT?

22   A.   YES, SIR, IT IS.

23   Q.   NOW, HE WASN'T THERE WHEN YOU CAME ACROSS THESE TWO

24   INDIVIDUALS ON MARCH 25TH, OF 2010, RIGHT?

25   A.   NO, SIR, HE WAS NOT.

1    Q.   AND YOU SPOKE WITH HIM AFTER YOU FOUND THESE TWO

2    INDIVIDUALS AND TOLD THEM WHAT HAPPENED ON THAT DAY, IS THAT

3    RIGHT?

4    A.   NO, I DID NOT.

5    Q.   YOU DID NOT EVER SPEAK WITH AGENT MESSIAHS AT ANY POINT?

6    A.   NO, SIR.

7    Q.   WHO DID YOU SPEAK WITH ABOUT WHAT HAPPENED ON THAT DAY?

8    A.   NO ONE.

9    Q.   OKAY.  YOU DID TESTIFY THAT YOU REVIEWED AGENT MESSIAHS'

10   REPORT, IS THAT CORRECT?

11   A.   YES.

12   Q.   AND THAT REPORT IS A SUMMARY OF WHAT HAPPENED ON MARCH

13   25TH, OF THIS YEAR, IS THAT CORRECT?

14   A.   YES, THAT'S CORRECT.

15   Q.   AND IN THAT REPORT ARE THE DETAILS SURROUNDING HOW YOU

16   FOUND MR. LEAL ON THAT DAY, IS THAT RIGHT?

17   A.   YES, SIR.

18   Q.   NOW, YOU, YOURSELF, HAVE WRITTEN REPORTS BEFORE, IS THAT

19   RIGHT?

20   A.   YES, SIR.

21   Q.   YOU HAVE NOT WRITTEN REPORTS BEFORE?

22   A.   YES, THAT'S CORRECT.

23   Q.   YOU HAVE WRITTEN REPORTS IN THE PAST.  YOU HAVE ALWAYS

24   TRIED TO BE ACCURATE, IS THAT CORRECT?

25   A.   YES, SIR.

```
 1    Q.   THOROUGH?

 2    A.   YES, SIR.

 3    Q.   COMPLETE?

 4    A.   YES, SIR.

 5    Q.   AND YOU WANTED TO BE SURE TO CAPTURE ALL THE IMPORTANT

 6    DETAILS ABOUT A CASE, IS THAT RIGHT?

 7    A.   THAT'S CORRECT.

 8    Q.   YOU KNOW THAT SOMEBODY ELSE MAY USE THAT REPORT LATER

 9    ON, IS THAT RIGHT?

10    A.   YES, SIR.

11    Q.   ANOTHER AGENT MAY USE THAT REPORT, RIGHT?

12    A.   YES, SIR.

13    Q.   A PROSECUTOR MAY USE THAT REPORT LATER ON, RIGHT?

14    A.   THAT'S CORRECT.

15    Q.   AND YOU HAVE NO REASON TO BELIEVE THAT AGENT MESSIAHS

16    WOULDN'T DO ANY OF THOSE THINGS AS WELL WHEN WRITING HIS

17    REPORT, RIGHT?

18         MR. MILLER:  OBJECTION, RELEVANCE, SPECULATION.

19         THE COURT:  SUSTAINED.  OUTSIDE THE SCOPE OF

20    REDIRECT -- RECROSS, I SHOULD SAY.

21    BY MR. FAKHOURY:

22    Q.   YOU HAVE REVIEWED THE REPORT OF AGENT MESSIAHS, IS THAT

23    RIGHT?

24    A.   YES, SIR.

25         MR. MILLER:  OBJECTION, ASKED AND ANSWERED.
```

```
 1              THE COURT:  OVERRULED.  HE IS ON CROSS.  THE ANSWER
 2    STANDS.
 3    BY MR. FAKHOURY:
 4    Q.   YOU HAD A CHANCE TO MAKE SURE IT WAS COMPLETE AND
 5    ACCURATE, CORRECT?
 6    A.   YES, SIR.
 7    Q.   IF THERE WAS SOMETHING WRONG IN THE REPORT, YOU COULD
 8    HAVE HAD THAT CORRECTED, RIGHT?
 9    A.   NO, SIR, THAT'S NOT CORRECT.  BY THE TIME I REVIEWED THE
10    REPORT, IT WAS ALREADY COMPLETED.
11    Q.   SO, IF THERE WAS SOMETHING IN THE REPORT THAT WAS
12    DIFFERENT THAN WHAT ACTUALLY HAPPENED, THERE IS NOTHING YOU
13    COULD DO TO CHANGE THAT?
14              MR. MILLER:  OBJECTION, SPECULATION, RELEVANCY.
15              THE COURT:  SUSTAINED.
16              MR. FAKHOURY:  MAY I HAVE A MINUTE, YOUR HONOR?
17              THE COURT:  CERTAINLY.
18    BY MR. FAKHOURY:
19    Q.   OKAY.  YOU ARE AWARE THAT AGENT MESSIAHS' REPORT
20    INDICATES THAT YOU FOUND MR. LEAL AT 6:30 IN THE MORNING, IS
21    THAT RIGHT?
22              MR. MILLER:  OBJECTION, BEYOND THE SCOPE,
23    RELEVANCE.
24              THE COURT:  SUSTAINED.  BEYOND THE SCOPE.
25              MR. FAKHOURY:  NOTHING FURTHER.  THANK YOU.
```

```
1              THE COURT:  REDIRECT?

2              MR. MILLER:  NO, YOUR HONOR.

3              THE COURT:  MAY THE WITNESS BE EXCUSED?

4              MR. MILLER:  YES, FROM THE UNITED STATES.

5              THE COURT:  MAY HE BE EXCUSED?

6              MR. MILLER:  YES.

7              THE COURT:  ANY OBJECTION?

8              MR. FAKHOURY:  NO, YOUR HONOR.

9              THE COURT:  THANK YOU VERY MUCH, SIR.  YOU ARE FREE

10   TO LEAVE, STAY AND LISTEN, WHATEVER YOU WANT TO DO.

11             THE WITNESS:  THANK YOU, YOUR HONOR.

12                       (WITNESS EXCUSED.)

13             MR. MILLER:  THE UNITED STATES CALLS ARISTEO

14   VAZQUEZ-ROJAS.

15                       (WITNESS SWORN.)

16             THE COURT:  GOOD MORNING, SIR.  HOW ARE YOU?

17             THE WITNESS:  FINE.

18             THE COURT:  LADIES AND GENTLEMEN OF THE JURY, THE

19   WITNESS, AS YOU CAN SEE, IS GOING TO BE USING A COURT

20   CERTIFIED TRANSLATOR FOR HIS TESTIMONY.  SHOULD ANY OF YOU

21   KNOW THE NON-ENGLISH LANGUAGE BEING USED, YOU MUST ACCEPT THE

22   NON-ENGLISH LANGUAGE GIVEN BY THE INTERPRETER SO YOU USE ALL

23   THE SAME INFORMATION.

24             MADAM CLERK:  COULD YOU STATE YOUR NAME AND SPELL

25   YOUR LAST NAME, PLEASE.
```

1          THE WITNESS:  VASQUEZ-ROJAS, ARISTEO.  THE FIRST

2     NAME, A-R-I-S-T-E-O, VAZQUEZ, V-A-S-Q-U-E-Z, ROJAS,

3     R-O-J-A-S.

4          MR. MILLER:  BEFORE I BEGIN MY EXAMINATION, I HAVE

5     NO NEED FOR THE SCREEN IF YOU WANT TO RAISE IT OR NOT.

6                    **ARISTEO VAZQUEZ-ROJAS**

7     CALLED AS A WITNESS HEREIN, HAVING BEEN FIRST DULY SWORN

8     WAS EXAMINED AND TESTIFIED AS FOLLOWS:

9                      **DIRECT EXAMINATION**

10    **BY MR. MILLER:**

11    Q.   WHAT IS YOUR CITIZENSHIP?

12    A.   MEXICO.

13    Q.   AND WHERE WERE YOU BORN?

14    A.   EL OBSCURO, SAN JACINTO, OAXACA.

15    Q.   AND DO YOU REMEMBER THE EVENT ON THE DAY OF YOUR

16    APPREHENSION BACK ON MARCH 25, 2010?

17    A.   YES.

18    Q.   ON THAT DAY, DID YOU HAVE ANY PERMISSION, OR PAPERS, OR

19    RIGHT TO BE IN THE UNITED STATES LEGALLY?

20    A.   NO.

21    Q.   WHERE DO YOU LIVE?

22    A.   IN OAXACA.

23    Q.   NOW, AT SOME POINT WHILE YOU WERE LIVING IN OAXACA, DID

24    YOU MAKE A DECISION TO TRY TO COME TO THE UNITED STATES?

25    A.   YES.

1    Q.   ABOUT HOW MANY DAYS?  EXCUSE ME -- DID YOU MAKE THAT

2    DECISION WHILE YOU WERE IN OAXACA?

3    A.   YES.

4    Q.   AND HOW MANY DAYS BEFORE YOU WERE APPREHENDED IN THIS

5    CASE DID YOU MAKE THAT DECISION?

6    A.   FIFTEEN DAYS BEFORE.

7    Q.   AND AFTER YOU MADE THAT DECISION, DID YOU TRAVEL FROM

8    OAXACA TO CLOSE TO THE UNITED STATES/MEXICAN BORDER?

9    A.   YES.

10   Q.   AND HOW DID YOU GET FROM OAXACA TO CLOSE TO THE US/

11   MEXICAN BORDER?

12   A.   AIRPLANE.

13   Q.   WHO PAID FOR THE FLIGHT?

14   A.   I DID.

15   Q.   WOULD YOU PLEASE TELL THE JURY ABOUT HOW FAR AWAY FROM

16   OAXACA IS THE US/MEXICAN BORDER, WHERE YOU WERE APPREHENDED?

17   YOU CAN SAY THAT IN MILES OR HOW LONG THE FLIGHT WAS.

18   A.   TO THE BORDER?

19   Q.   YES.

20   A.   FOUR FOR FIVE HOURS.  I'M NOT SURE.

21   Q.   BY PLANE?

22   A.   YES.

23   Q.   WHERE DID YOU FLY TO?

24   A.   TIJUANA.

25   Q.   AND HOW MANY DAYS BEFORE YOUR APPREHENSION IN THIS CASE

1    DID YOU ARRIVE IN TIJUANA?

2    A.   I DON'T REMEMBER EXACTLY.   IT MUST HAVE BEEN ABOUT TEN

3    DAYS.

4    Q.   NOW, PRIOR TO LEAVING YOUR HOME OF OAXACA, HAD YOU MADE

5    ANY ARRANGEMENTS TO BE SMUGGLED INTO THE UNITED STATES?

6    A.   NO.

7    Q.   WAS YOUR PLAN TO MAKE ARRANGEMENTS AFTER YOU HAD ARRIVED

8    IN TIJUANA?

9    A.   YES.

10   Q.   NOW, BETWEEN THE TIME THAT YOU FLEW INTO TIJUANA AND THE

11   TIME YOU WERE APPREHENDED, HAD YOU BEEN APPREHENDED BY THE

12   BORDER PATROL ELSEWHERE?

13   A.   YES.

14   Q.   WHERE WERE YOU APPREHENDED BEFORE YOU WERE CAUGHT IN

15   THIS CASE?

16   A.   SONOITA.

17   Q.   DO YOU KNOW WHAT STATE IN THE UNITED STATES THAT IS

18   NEAR?

19   A.   NOT EXACTLY.

20   Q.   BUT PHOENIX, ARIZONA, WHEN YOU WERE CAUGHT, I AM SORRY,

21   SONOITA, WHAT WAS THE AREA YOU WERE CAUGHT NEAR?

22   A.   SONOITA.

23   Q.   SONOITA.   DID YOU MAKE ARRANGEMENTS TO BE BROUGHT INTO

24   THE UNITED STATES WHEN YOU WERE CAUGHT AT THAT TIME?

25   A.   YES.

1    Q.   AND AFTER YOU WERE CAUGHT WHAT DID THE US AUTHORITIES DO

2    WITH YOU?

3    A.   THEY SENT ME BACK TO MEXICO.

4    Q.   DO YOU KNOW WHERE INTO THE UNITED STATES THEY SENT YOU

5    BACK INTO MEXICO?

6    A.   FROM PHOENIX.

7    Q.   WHEN YOU WERE SENT BACK TO MEXICO FROM PHOENIX, WHERE

8    DID YOU GO?

9    A.   NOGALES.

10   Q.   AND THEN FROM NOGALES WHERE DID YOU GO?

11   A.   TIJUANA.

12   Q.   HOW MANY DAYS BEFORE YOU WERE CAUGHT IN THIS CASE HAD

13   YOU BEEN SENT BACK TO MEXICO FROM PHOENIX, NEAR NOGALES?

14   A.   TEN DAYS MAYBE.

15   Q.   THE TIME BETWEEN THE TIME THAT YOU WERE SENT BACK TO THE

16   UNITED STATES -- SENT BACK TO MEXICO AND WENT TO -- GOT

17   CAUGHT IN THIS CASE?

18   A.   FIVE OR SIX DAYS.

19   Q.   WHERE DID YOU GO IN TIJUANA AFTER YOU WERE SENT BACK TO

20   MEXICO?

21   A.   I DON'T KNOW THE NAME OF THE PLACE, BUT THERE WAS A BIG

22   ARCH.

23   Q.   WELL, WHERE DID YOU STAY IN TIJUANA ONCE YOU WERE SENT

24   BACK TO MEXICO?

25   A.   HOTEL DIAZ.

1    Q.   AND HOW MANY DAYS DID YOU STAY AT HOTEL DIAZ BEFORE YOU

2    WERE CAUGHT IN THIS CASE?

3    A.   TWO OR THREE DAYS.

4    Q.   AND WHILE YOU WERE STAYING AT THE HOTEL DIAZ IN TIJUANA,

5    DID YOU MAKE ARRANGEMENTS TO BE SMUGGLED INTO THE UNITED

6    STATES?

7    A.   YES.

8    Q.   AND THE PEOPLE WITH WHOM YOU MADE ARRANGEMENTS IN THIS

9    CASE WERE THEY DIFFERENT THAN THE PEOPLE YOU MADE

10   ARRANGEMENTS WHEN YOU WERE CAUGHT NEAR ARIZONA?

11   A.   YES.

12   Q.   AND HOW DID YOU MAKE ARRANGEMENTS WHILE YOU WERE STAYING

13   AT THE HOTEL DIAZ IN TIJUANA TO BE SMUGGLED INTO THE UNITED

14   STATES?

15   A.   THROUGH A FRIEND.

16   Q.   AND WHO WAS THAT FRIEND?

17   A.   MAURO.

18   Q.   AND HAD YOU KNOWN MAURO BEFORE YOU STARTED STAYING AT

19   THE HOTEL DIAZ OR DID YOU MEET HIM THERE?

20   A.   BEFORE.

21   Q.   AND HOW DID YOU KNOW HIM FROM BEFORE?

22   A.   HE'S A NEIGHBOR OF MY RANCH OR THE PLACE WHERE I LIVE.

23   Q.   AND DO YOU KNOW WHAT HIS LAST NAME IS?

24   A.   RAMIREZ.

25   Q.   AND WHAT DID HE DO TO HELP YOU MAKE ARRANGEMENTS TO COME

1    TO THE UNITED STATES?

2    A.   WELL, HE GOT IN TOUCH WITH THE COYOTE TO MAKE

3    ARRANGEMENTS.

4    Q.   DID YOU MEET WITH THIS COYOTE?

5    A.   YES.

6    Q.   WHERE DID YOU MEET THIS COYOTE?

7    A.   AT THE ARCH.

8    Q.   AND WHEN YOU SAY COYOTE, WHAT DO YOU MEAN?

9    A.   THE GUIDE THAT WOULD BRING US.

10   Q.   AND WHEN YOU MET WITH THIS GUIDE, DID YOU AGREE TO PAY

11   ANY MONEY TO BE BROUGHT TO THE UNITED STATES?

12   A.   YES.

13   Q.   HOW MUCH WERE YOU GOING -- PLANNING TO PAY TO BE BROUGHT

14   TO THE UNITED STATES?

15   A.   BETWEEN 2300 OR 2500, I DON'T REMEMBER EXACTLY.

16   Q.   DID THIS AGREEMENT, ARRANGEMENT INCLUDE HOW FAR INTO THE

17   UNITED STATES YOU WERE GOING TO BE BROUGHT?

18   A.   LOS ANGELES.

19   Q.   AND WHEN YOU MET WITH THE COYOTE, WHO ELSE WAS THERE?

20   A.   ONLY MY FRIEND, MAURO.

21   Q.   IS THE PERSON THAT YOU MET IN THE ARCH PRESENT IN THE

22   COURTROOM TODAY?

23   A.   YES.

24   Q.   WOULD YOU PLEASE POINT HIM OUT AND DESCRIBE AN ARTICLE

25   OF CLOTHING THAT HE IS WEARING?

```
 1    A.   OVER THERE AND HE HAS SOME EAR PHONES.

 2         MR. MILLER:  MAY THE RECORD REFLECT HE HAS

 3    IDENTIFIED THE DEFENDANT?

 4         THE COURT:  IT MAY SO REFLECT.

 5    BY MR. MILLER:

 6    Q.   AFTER YOU MADE ARRANGEMENTS WITH THE DEFENDANT, DID HE

 7    TELL YOU ANYTHING ABOUT HOW YOU WERE GOING TO BE BROUGHT TO

 8    THE UNITED STATES?

 9    A.   NO.

10    Q.   AT SOMETIME AFTER YOU MET THE DEFENDANT AT THE ARCHES,

11    DID YOU TRAVEL SOMEWHERE TO ENTER THE UNITED STATES?

12         THE INTERPRETER:  EXCUSE ME, COUNSEL, CAN YOU

13    REPEAT YOUR QUESTION.

14    BY MR. MILLER:

15    Q.   AFTER YOU MET THE DEFENDANT AT THE ARCHES, WHAT DID YOU

16    DO?

17    A.   LIKE WHAT?

18    Q.   WELL, YOU SAID THAT YOU MET THE DEFENDANT AT THE ARCHES?

19    A.   YES.

20    Q.   AND YOU MADE ARRANGEMENTS, RIGHT?

21    A.   YES.

22    Q.   WHERE DID YOU GO AFTER YOU MET THE DEFENDANT AT THE

23    ARCHES?

24    A.   WE TOOK A BUS TO GO TO TECATE, TO GO TO LA MATOLA.

25    Q.   DID YOU GO IMMEDIATELY FROM THE ARCHES TO THE BUS
```

1   STATION OR DID YOU SPEND THE NIGHT IN TIJUANA?

2   A.   WE SPENT ONE OR TWO NIGHTS AND THEN WE LEFT.

3   Q.   AND WHERE DID YOU PICK UP THE BUS?

4   A.   IN TIJUANA.

5   Q.   AND HOW DID YOU KNOW THAT YOU HAD TO PICK UP THE BUS TWO

6   DAYS AFTER YOU MET WITH THE DEFENDANT?

7   A.   HE TOLD US.

8   Q.   HE BEING WHO?

9   A.   THE COYOTE.

10  Q.   AND WHEN YOU SAY THE COYOTE, IS THAT THE PERSON YOU

11  IDENTIFIED HERE IN COURT?

12          MR. FAKHOURY:  OBJECTION, LEADING.

13          THE COURT:  OVERRULED.

14          MR. MILLER:  I'M SORRY, OVERRULED?

15          THE COURT:  OVERRULED.

16  BY MR. MILLER:

17  Q.   WHEN YOU SAY THE COYOTE, IS THAT THE PERSON YOU

18  IDENTIFIED HERE IN COURT?

19  A.   YES.

20  Q.   WHEN YOU SAY YOU PICKED UP THE BUS IN TIJUANA, THE BUS

21  STATION AT TIJUANA FOR -- WAS IT A BUS STOP?

22  A.   YES.

23  Q.   I'M SORRY, WAS IT A BUS STATION OR A BUS STOP?

24  A.   IT WAS THE STATION.

25  Q.   WHEN YOU ARRIVED AT THE BUS STATION, DID YOU SEE THE

1    DEFENDANT THERE?

2    A.   YES.

3    Q.   AND WHAT WAS HE DOING WHEN YOU FIRST SAW HIM, WHEN YOU

4    ARRIVED AT THE BUS STATION?

5    A.   WELL, I THINK HE WAS WAITING FOR US TO GO TOGETHER TO

6    TECATE.

7    Q.   DID YOU MAKE CONTACT WITH THE DEFENDANT?

8    A.   YES.

9    Q.   AND WHEN YOU MADE CONTACT WITH THE DEFENDANT, DID HE SAY

10   ANYTHING TO YOU?

11   A.   YES, ONLY THAT WE HAD TO GET OFF THE BUS WHENEVER HE GOT

12   OFF THE BUS.

13   Q.   DID YOU GET A BUS TICKET?

14   A.   YES.

15   Q.   AND WHO PAID FOR THE BUS TICKET?

16   A.   I DID.

17   Q.   AND HOW DID YOU BUY IT?

18   A.   CASH.

19   Q.   HOW DID YOU KNOW WHICH BUS YOU HAD TO BUY A TICKET FOR?

20   A.   OH, BECAUSE HE TOLD US.

21   Q.   NOW, AFTER YOU BOUGHT THE TICKET, DID YOU GET ON THE

22   BUS?

23   A.   YES.

24   Q.   WHO ELSE WAS ON THE BUS WITH YOU?

25   A.   SOME OTHER FRIENDS.

1    Q.   WAS ONE OF THE FRIENDS MAURO?

2    A.   YES.

3    Q.   WHERE WAS THE DEFENDANT WHEN YOU GOT ON THE BUS?

4    A.   THERE IN THE BUS.

5    Q.   HOW LONG WAS YOUR BUS RIDE?

6    A.   ABOUT 45 MINUTES OR AN HOUR.  I DON'T REMEMBER EXACTLY.

7    Q.   WHILE YOU WERE RIDING THE BUS, DID YOU HAVE ANY

8    CONVERSATION WITH THE DEFENDANT?

9    A.   YES.

10   Q.   AND WHAT DID HE TELL YOU DURING THE BUS RIDE?

11   A.   THAT WHENEVER HE GOT OFF THE BUS, WE HAD TO FOLLOW HIM.

12   Q.   AT SOME POINT, DID THE DEFENDANT GET OFF THE BUS?

13   A.   YES.

14   Q.   WHAT DID YOU DO WHEN HE GOT OFF THE BUS?

15   A.   I ALSO GOT OFF THE BUS.

16   Q.   DID ANYONE ELSE GET OFF THE BUS WHEN YOU AND THE

17   DEFENDANT GOT OFF THE BUS?

18   A.   YES.

19   Q.   HOW MANY PEOPLE?

20   A.   I DON'T REMEMBER EXACTLY BUT IT MUST HAVE BEEN ABOUT SIX

21   OR SEVEN.

22   Q.   WHAT DID YOU DO AFTER YOU GOT OFF THE BUS?

23   A.   WE FOLLOWED HIM.

24   Q.   AND WHEN YOU SAY HIM YOU MEAN THE DEFENDANT?

25            MR. FAKHOURY:  OBJECTION, LEADING.

```
 1              THE COURT:  OVERRULED.

 2              THE WITNESS:  YES.

 3  BY MR. MILLER:

 4  Q.   WHERE DID YOU FOLLOW HIM TO?

 5  A.   TOWARDS THE BORDER.

 6  Q.   NOW, WHEN YOU GOT OFF THE BUS, WAS THAT AROUND THAT BUS

 7  STOP?

 8  A.   A GAS STATION.

 9  Q.   NOW, DID YOU STAY FOR ANY PERIOD OF TIME AT THE GAS

10  STATION?

11  A.   YES, CLOSE BY FOR ABOUT AN HOUR, HOUR-AND-A-HALF.

12  Q.   DID ANY PEOPLE JOIN YOU AFTER THAT HOUR,

13  HOUR-AND-A-HALF?

14  A.   YES.

15  Q.   AND HOW MANY PEOPLE JOINED YOU?

16  A.   I DON'T REMEMBER, BUT IT MIGHT HAVE BEEN ABOUT FIVE OR

17  SIX.

18  Q.   WHEN YOU SAY WAITING NEARBY THE GAS STATION, WHERE NEAR

19  THE GAS STATION DID YOU WAIT FOR HOUR OR AN HOUR-AND-A-HALF?

20  A.   TOWARDS THE NORTH SIDE.

21  Q.   WHAT DID YOU WAIT BY?  WAS THERE A PICNIC BENCH?  WAS IT

22  A TREE?  WAS IT A 7-11?

23  A.   JUST SMALL BUSHES.

24  Q.   DURING THAT HOUR OR HOUR-AND-A-HALF DID THE DEFENDANT

25  SAY ANYTHING TO YOU?
```

1    A.    YES.

2    Q.    WHAT DID HE SAY?

3    A.    THAT WE WERE GOING TO WAIT FOR THE REST OF THE PEOPLE TO

4    CONTINUE.

5    Q.    AFTER THE REST OF THE PEOPLE ARRIVED, DID THE DEFENDANT

6    SAY ANYTHING TO YOU OR THE GROUP?

7    A.    YES.

8    Q.    WHAT DID THE DEFENDANT SAY TO YOU OR THE GROUP?

9    A.    THAT IT WAS TIME TO START WALKING.

10   Q.    AND I'M SORRY, IT MIGHT BE OBVIOUS, WHILE YOU WERE

11   WAITING FOR THE HOUR, HOUR-AND-A-HALF, WERE YOU WAITING WITH

12   THE GROUP OF PEOPLE THAT GOT OFF THE BUS WITH YOU?

13   A.    YES, WE CONTINUED WAITING.

14   Q.    WHEN THE DEFENDANT SAID IT WAS TIME FOR YOU TO WALK,

15   WHAT DID YOU DO?

16   A.    WE FOLLOWED HIM.

17   Q.    AND WHERE DID HE LEAD YOU TO?

18   A.    TO THE BORDER.

19   Q.    NOW, HOW LONG DID YOU FOLLOW HIM TO THE BORDER?

20   A.    TWO OR THREE HOURS, I DON'T REMEMBER.

21   Q.    DID YOU HAVE ANY STOPS IN BETWEEN THE GAS STATION AREA

22   AND THE BORDER?

23   A.    YES.

24   Q.    WHERE DID YOU STOP?

25   A.    IN SOME ABANDONED HOUSES.

```
1    Q.   AND HOW LONG DID IT TAKE FOR YOU TO WALK FROM THE GAS
2    STATION AREA TO THESE ABANDONED HOUSES?
3    A.   TWO OR THREE HOURS.
4    Q.   AND DURING THE TWO OR THREE HOURS THAT THE DEFENDANT WAS
5    LEADING YOU TO THE ABANDONED HOUSES, DID HE SAY ANYTHING TO
6    YOU OR THE GROUP?
7    A.   NO.
8    Q.   WHAT DID YOU AND THE GROUP DO WHEN YOU GOT TO THE
9    ABANDONED HOUSES?
10   A.   OH, WELL, OH, HE TOLD US TO WAIT THERE BECAUSE THERE WAS
11   A LOT OF IMMIGRATION PEOPLE.
12        MR. FAKHOURY:  OBJECTION, YOUR HONOR, RULE 16.
13        THE COURT:  OVERRULED.
14   BY MR. MILLER:
15   Q.   WHEN YOU ARRIVED AT THE ABANDONED HOUSES, DO YOU KNOW
16   WHAT TIME OF DAY IT WAS?
17   A.   IT WAS AT NIGHT.
18   Q.   WHEN YOU STARTED WALKING FROM THE GAS STATION AREA TO
19   THE ABANDONED HOUSE, WAS THAT AT THE NIGHTTIME OR WAS THE SUN
20   UP?
21   A.   NO, IT WAS AT NIGHT.
22   Q.   HOW LONG DID YOU STAY AT THE ABANDONED HOUSES?
23   A.   THE REST OF THE NIGHT.
24   Q.   AND WHAT DID YOU DO FOR THE REST OF THE NIGHT?
25   A.   WE SLEPT.
```

1   Q.   AFTER YOU SLEPT, WHAT HAPPENED THE NEXT DAY -- ACTUALLY

2   LET ME BACK UP AND SET THE SCENE.  WHEN YOU WOKE UP, WAS THE

3   SUN UP OR WAS THE SUN DOWN?

4   A.   THERE WAS NO SUN YET.

5   Q.   DO YOU KNOW WHAT TIME IT WAS WHEN YOU WOKE UP?

6   A.   5:30 OR 6:00 IN THE MORNING.  I DON'T REMEMBER EXACTLY.

7   Q.   WHEN YOU WOKE UP, WHAT DID YOU DO?

8   A.   WE WAITED FOR HIS ORDERS TO START WALKING.

9   Q.   AT SOMETIME DID YOU RECEIVE HIS ORDERS?

10  A.   YES.

11        MR. FAKHOURY:  YOUR HONOR, SORRY TO INTERRUPT,

12  OBJECTION, RULE 16, STATEMENTS NOT PROVIDED.  WE HAVEN'T

13  RECEIVED THESE STATEMENTS.

14        THE COURT:  OVERRULED.

15  BY MR. MILLER:

16  Q.   AT SOME TIME, DID YOU RECEIVE HIS ORDERS?

17  A.   YES.

18  Q.   AND WHEN DID YOU RECEIVE THE ORDERS?

19  A.   WHEN IT WAS DAYLIGHT.

20  Q.   AND WHAT WERE THE ORDERS?

21        MR. FAKHOURY:  SAME OBJECTION.

22        THE COURT:  OVERRULED.

23        THE WITNESS:  FOR US TO FOLLOW HIM.  THAT WE HAD TO

24  START WALKING.

25

1    BY MR. MILLER:

2    Q.   AND DID YOU THEN START FOLLOWING HIM?

3    A.   YES.

4    Q.   AND WITH WHOM WERE YOU TRAVELING WITH NOW?

5    A.   WITH MY FRIEND MAURO.

6    Q.   DID YOU HAVE ANY OTHER FRIENDS WITH WHOM YOU WERE

7    TRAVELING?

8    A.   YES.

9    Q.   HOW MANY OTHER FRIENDS?

10   A.   FOUR.

11   Q.   AND AT SOME POINT WHEN YOU STARTED WALKING FROM THE

12   ABANDONED HOUSES, DID YOU REACH THE UNITED STATES/MEXICAN

13   BORDER?

14   A.   NO.

15   Q.   DID YOU STOP SOMETIME BEFORE YOU REACHED THE US/MEXICAN

16   BORDER?

17   A.   YES.

18   Q.   AND WHERE DID YOU STOP?

19   A.   IT WAS LIKE A WATER - ARROYO.

20   Q.   AND WHEN YOU SAY IT WAS AN ARROYO, WAS IT LIKE A CREEK?

21   A.   YES.

22   Q.   HOW LONG DID IT TAKE FOR YOU TO WALK FROM THE ABANDONED

23   HOUSE TO THIS ARROYO?

24   A.   ABOUT 40 MINUTES OR AN HOUR, BUT I DON'T REMEMBER

25   EXACTLY.

```
 1    Q.   DURING THE TIME THAT YOU WALKED FROM THE ABANDONED HOUSE

 2    TO THE ARROYO, DID THE DEFENDANT SAY ANYTHING TO YOU?

 3    A.   NO.

 4    Q.   WHAT HAPPENED WHEN YOU AND YOUR GROUP ARRIVED AT THE

 5    ARROYO?

 6    A.   THERE THE DEFENDANT TOLD US WE HAD TO SPEND THE REST OF

 7    THE DAY THERE.

 8              MR. FAKHOURY:  OBJECTION, AGAIN, RULE 16.

 9              THE COURT:  SUSTAINED -- OVERRULED, RATHER.

10    BY MR. MILLER:

11    Q.   WHEN YOU ARRIVED AT THE ARROYO, WAS THE SUN UP OR WAS

12    THE SUN DOWN?

13    A.   THE SUN WAS BARELY COMING UP.

14    Q.   AND HOW LONG DID YOU STAY AT THE ARROYO?

15    A.   THE WHOLE DAY.

16    Q.   AT SOME POINT, WHILE YOU WERE STAYING AT THE ARROYO, DID

17    THE DEFENDANT SAY ANYTHING TO YOU?

18    A.   NO.

19    Q.   AT SOME POINT, DID YOU AND YOUR GROUP LEAVE THE ARROYO?

20    A.   NO, WE WAITED FOR HIM TO GIVE US ORDERS TO START

21    WALKING.

22    Q.   AT SOMETIME WHILE YOU WERE AT THE ARROYO, DID HE GIVE

23    YOU RECORDS TO START WALKING?

24              MR. FAKHOURY:  SAME OBJECTION, RULE 16.

25              THE COURT:  OVERRULED.
```

1          THE WITNESS:  YES.

2     BY MR. MILLER:

3     Q.   AND WHEN HE GAVE YOU THOSE ORDERS, AROUND WHAT TIME OF

4     DAY WAS IT?

5     A.   IT WAS BEGINNING -- THE SUN WAS BEGINNING TO COME DOWN.

6     Q.   AND WHEN THE DEFENDANT TOLD YOU TO START WALKING, DID

7     YOU THEN FOLLOW HIM?

8     A.   YES.

9     Q.   WHERE DID THE DEFENDANT TAKE YOU?

10    A.   TO THE BORDER.

11    Q.   AND FROM THE ARROYO TO THE BORDER HOW LONG DID YOU WALK?

12    A.   I DON'T REMEMBER EXACTLY, BUT IT MUST HAVE BEEN ABOUT

13    20, 30 MINUTES.

14    Q.   AND WHEN YOU ARRIVED AT THE BORDER, HOW DID YOU KNOW

15    THAT IT WAS THE BORDER?

16    A.   BECAUSE THERE WAS A WIRE FENCE THAT WAS DOWN.

17    Q.   WHEN YOU REACHED THE BORDER, DID THE DEFENDANT SAY

18    ANYTHING TO YOU OR THE GROUP?

19          MR. FAKHOURY:  OBJECTION, RULE 16.

20          THE COURT:  OVERRULED.

21          THE WITNESS:  YES.

22    BY MR. MILLER:

23    Q.   WHAT DID HE TELL YOU?

24    A.   THAT WE WERE ABOUT TO CROSS THE BORDER.

25    A.   DID YOU AND YOUR GROUP CROSS THE BORDER?

1    A.   YES.

2    Q.   AND WHAT HAPPENED AFTER YOU AND YOUR GROUP CROSSED THE

3    BORDER?

4    A.   HE TOLD US -- HE TOLD US THAT WE HAD TO WAIT THERE FOR

5    ONE NIGHT AND ONE DAY.

6              MR. FAKHOURY:  SAME OBJECTION, RULE 16.

7              THE COURT:  OVERRULED.

8    BY MR. MILLER:

9    Q.   AND THEN WHEN DID YOU -- AFTER YOU CROSSED THE BORDER,

10   WHERE DID YOU GO?

11   A.   WE HID THERE CLOSE TO A DIRT ROAD.

12   Q.   AND AT SOME POINT DID YOU CROSS THE DIRT ROAD?

13   A.   YES.

14   Q.   AND HOW DID YOU CROSS THE DIRT ROAD?

15   A.   THE DEFENDANT PLACED SOME BLANKETS.

16   Q.   AND DID THE BLANKETS CROSS THE DIRT ROAD?

17   A.   YES.

18   Q.   AND AFTER HE PLACED THE BLANKET -- DID ANYONE ELSE

19   ASSIST HIM IN PLACING THE BLANKETS, THAT YOU KNOW?

20   A.   YES, ANOTHER PERSON.

21   Q.   AFTER THE BLANKETS WERE PLACED ON THE ROAD, WHAT DID YOU

22   DO?

23   A.   HE TOLD US TO CROSS.

24   Q.   AND DID YOU?

25   A.   YES.

1   Q.   AND WHEN YOU SAY HE, WHO DO YOU MEAN?

2   A.   THE DEFENDANT.

3        MR. FAKHOURY:  AGAIN, YOUR HONOR, SAME OBJECTION,

4   RULE 16.  WE HAVEN'T RECEIVED ANY OF THESE STATEMENTS.

5        THE COURT:  OVERRULED.

6   BY MR. MILLER:

7   Q.   WHEN YOU CROSSED OVER THE BLANKETS, WHAT DID YOU DO?

8   A.   NO, I JUST WENT ON TOP OF THEM.

9   Q.   AND ONCE YOU WENT ON TOP OF THEM AND GOT TO THE OTHER

10  SIDE OF THE ROAD, WHAT DID YOU DO?

11  A.   WE RAN TO HIDE.

12  Q.   AND DID YOU SEE ANYONE REMOVE THE BLANKETS FROM THE

13  ROAD?

14  A.   NO.

15  Q.   WHERE WERE YOU -- HOW FAR PASSED THE ROAD DID YOU RUN

16  AND HIDE?

17  A.   MAYBE 200 METERS, 150, I DON'T KNOW EXACTLY.

18  Q.   AND WHO WAS WITH YOU WHEN YOU WERE RUNNING TO HIDE?

19  A.   THE DEFENDANT.

20  Q.   AT SOME POINT, DID YOU STOP?

21  A.   YES.

22  Q.   AND WHAT HAPPENED WHEN YOU STOPPED?

23  A.   WELL, WE STOPPED ABOUT 200 METERS AWAY FROM THE BORDER

24  TO HIDE.

25  Q.   AND BETWEEN THE TIME THAT YOU CROSSED THE ROAD AND THE

1   TIME THAT YOU HID, DID THE DEFENDANT SAY ANYTHING TO YOU?

2   A.   YES.

3            MR. FAKHOURY:  SAME OBJECTION, RULE 16.

4            THE COURT:  OVERRULED.

5   BY MR. MILLER:

6   Q.   WHAT DID HE SAY TO YOU?

7   A.   THAT WE WERE GOING TO HIDE THERE THE REST OF THE NIGHT.

8   Q.   AND WHEN YOU SAID THAT YOU RAN FROM THE ROAD TO THE --

9   TO HIDE, AND YOU WERE WITH THE DEFENDANT, WERE YOU WITH OTHER

10  PEOPLE IN THE GROUP?

11  A.   YES.

12  Q.   AND WHEN HE TOLD YOU TO HIDE THERE, WHAT DID YOU DO?

13  A.   WE HID.

14  Q.   AND AFTER YOU HID, DO YOU KNOW WHAT THE DEFENDANT DID?

15  A.   HE WENT SOMEWHERE ELSE.

16  Q.   NOW, AT SOMETIME BEFORE YOU HID, DID YOU SEE ANYTHING

17  THAT INDICATED THAT THERE WAS BORDER PATROL ACTIVITY?

18  A.   YES.

19  Q.   NOW, DID YOU SEE -- WHERE WERE YOU WHEN YOU SAW WHAT YOU

20  TOOK AS BORDER PATROL ACTIVITY?

21  A.   ONCE WE WERE HIDING ALREADY, ONCE WE HAD ALREADY CROSSED

22  THE ROAD, THEN WE SAW SOME LIGHTS AND WE THOUGHT THAT THEY

23  MIGHT BE IMMIGRATION PEOPLE.

24  Q.   SO, WHEN YOU SAW THE LIGHTS -- DID YOU HIDE BECAUSE OF

25  THE LIGHTS OR DID YOU SEE THE LIGHTS AFTER YOU HID?

1   A.   AFTER WE HAD ALREADY HID.

2   Q.   NOW, AT SOME POINT, YOU WERE CONTACTED BY BORDER PATROL

3   AGENTS WHILE YOU WERE HIDING?

4   A.   NO, THEY ARRIVED LATER ON WHEN WE WERE ALREADY HIDING.

5   Q.   OKAY.  SO, AFTER YOU WERE HIDING, YOU WERE EVENTUALLY

6   CONTACTED BY BORDER PATROL AGENTS?

7   A.   YES.

8   Q.   AND HOW LONG DID YOU HIDE BEFORE YOU WERE CONTACTED BY

9   BORDER PATROL AGENTS?

10  A.   I DON'T REMEMBER EXACTLY, BUT IT MUST HAVE BEEN ABOUT A

11  HALF HOUR, 40 MINUTES.

12  Q.   AND ONCE YOU WERE APPREHENDED BY THE BORDER PATROL

13  AGENTS, DID YOU HAVE ANY OTHER CONTACT WITH THE DEFENDANT?

14  A.   NO.

15          MR. MILLER:  YOUR HONOR, MAY WE GO SIDEBAR FOR JUST

16  A MOMENT?

17             THE COURT:  CERTAINLY.  COME ON UP.

18                 (SIDEBAR CONFERENCE HELD

19               OUTSIDE THE PRESENCE OF THE JURY.)

20          MR. MILLER:  WHAT I PROPOSE TO DO IS PULL UP A

21  STILL FRAME OF MAURO'S DEPOSITION AND SHOW IT TO THE WITNESS

22  FOR HIM TO IDENTIFY WHETHER OR NOT THIS IS THE SAME PERSON

23  THAT HE WAS REFERRING TO.

24             THE COURT:  YOU MEAN A PICTURE OF MR. MAURO?

25             MR. MILLER:  IT WOULD BE THE STILL FRAME OF THE

1    DEPOSITION.

2              THE COURT:  WITH MR. MAURO IN IT?

3              MR. MILLER:  YES.

4              THE COURT:  THAT'S HOW YOU WANT TO IDENTIFY

5    MR. MAURO, THAT SEEMS APPROPRIATE.

6              MR. FAKHOURY:  THAT'S NOT A PROBLEM.  IT'S JUST THE

7    STILL IMAGE.

8              MR. MILLER:  IT WOULD BE THE PAUSED IMAGE OF THE

9    DEPOSITION.

10             THE COURT:  THAT'S FINE.

11                  (BACK BEFORE THE JURY.)

12             MR. MILLER:  I APOLOGIZE, YOUR HONOR, I PUNCHED IT

13   UP BECAUSE IF I LEFT IT IN THE COMPUTER IT WOULD HAVE

14   STARTED.

15             THE COURT:  THAT'S FINE.

16   BY MR. MILLER:

17   Q.   NOW, I SHOW YOU A SCREEN ON THIS COMPUTER, DO YOU

18   RECOGNIZE THE PERSON THAT'S DEPICTED IN THIS STILL FRAME?

19   A.   YES.

20   Q.   AND WHO'S THAT?

21   A.   MY FRIEND, MAURO RAMIREZ.

22             MR. MILLER:  MAY I PUBLISH THAT TO THE JURY, YOUR

23   HONOR?

24             THE COURT:  YES.  PROBABLY DIM THE LIGHTS, IF THAT

25   HELPS.

1    BY MR. MILLER:

2    Q.   NOW, SINCE YOUR APPREHENSION IN THIS CASE, HAVE YOU HAD

3    ANY CONTACT WITH MAURO?

4    A.   ONLY WHEN WE WERE IN PRISON.

5    Q.   AND AT SOME POINT NOW, YOU WERE RELEASED FROM PRISON?

6    A.   YES.

7    Q.   AND AFTER YOU WERE RELEASED, HAVE YOU HAD ANY CONTACT

8    WITH MAURO?

9    A.   NO.

10           MR. MILLER:  IF I MAY TAKE JUST A MOMENT, YOUR

11   HONOR?

12           THE COURT:  CERTAINLY.  PUT THE LIGHTS BACK UP.

13           MR. MILLER:  NO FURTHER QUESTIONS, YOUR HONOR.

14           THE COURT:  CROSS EXAMINATION?

15           MR. FAKHOURY:  YES, YOUR HONOR.  COULD I HAVE ONE

16   QUICK MINUTE, YOUR HONOR?

17           THE COURT:  CERTAINLY.

18                    **CROSS EXAMINATION**

19   **BY MR. FAKHOURY:**

20   Q.   GOOD MORNING, MR. VAZQUEZ.

21   A.   GOOD MORNING.

22   Q.   SIR, YOU ARE FROM OAXACA, IS THAT CORRECT?

23   A.   YES.

24   Q.   THAT'S IN THE SOUTH OF MEXICO, CORRECT?

25   A.   YES.

1   Q.   AND IN MARCH OF 2010, YOU WANTED TO COME TO THE UNITED

2   STATES, CORRECT?

3   A.   YES.

4   Q.   YOU LIVED HERE BEFORE, RIGHT?

5   A.   YES.

6   Q.   YOU LIVED HERE ILLEGALLY BEFORE?

7   A.   YES.

8   Q.   YOU'D WORKED HERE BEFORE?

9   A.   YES.

10  Q.   AND THAT WAS IN NORTHERN CALIFORNIA, CORRECT?

11  A.   YES.

12  Q.   SANTA ROSA?

13  A.   YES.

14  Q.   AND THAT'S CLOSE TO SAN FRANCISCO?

15  A.   YES.

16  Q.   YOU EARNED MORE MONEY HERE IN AMERICA THAN YOU DID IN

17  MEXICO, CORRECT?

18  A.   YES.

19  Q.   AND THAT'S WHY YOU WANTED TO LIVE HERE, RIGHT?

20  A.   YES.

21  Q.   MAKE MONEY?

22  A.   YES.

23  Q.   USE THAT MONEY TO HELP SUPPORT YOUR FAMILY?

24  A.   YES.

25  Q.   MAKE A BETTER LIFE FOR YOURSELF?

1    A.   YES.

2    Q.   MAKE A BETTER LIFE FOR YOUR FAMILY?

3    A.   YES.

4    Q.   NOW, IT'S A LONG TRIP FROM OAXACA TO TIJUANA, CORRECT?

5    A.   YES.

6    Q.   AND YOUR FAMILY IS IN OAXACA?

7    A.   YES.

8    Q.   I BELIEVE YOU TESTIFIED IT'S ABOUT A FOUR OR FIVE HOUR

9    FLIGHT FROM OAXACA TO TIJUANA, IS THAT RIGHT?

10   A.   YES.

11   Q.   AND YOU DECIDED IT WAS WORTH IT TO MAKE THE TRIP?

12   A.   YES.

13   Q.   AND THAT'S WHY YOU BOUGHT A PLANE TICKET?

14   A.   YES.

15   Q.   SAID GOODBYE TO YOUR FAMILY IN OAXACA?

16   A.   YES.

17   Q.   YOU GOT ON THE PLANE AND FLEW TO TIJUANA?

18   A.   YES.

19   Q.   AND I BELIEVE YOU SAID IT WAS ABOUT TWO WEEKS BEFORE

20   YOUR ARREST IN THIS CASE WHEN YOU MADE IT TO TIJUANA, IS THAT

21   CORRECT?

22   A.   YES.

23   Q.   NOW, I KNOW MR. MILLER TALKED WITH YOU A LITTLE BIT

24   ABOUT THIS, BUT MARCH 25TH IS NOT THE FIRST TIME YOU WERE

25   ARRESTED TRYING TO ILLEGALLY ENTER THE UNITED STATES,

1  CORRECT?

2  A.   YES.

3  Q.   YOU TESTIFIED MAYBE EIGHT OR TEN DAYS BEFORE YOU WERE

4  ARRESTED IN ARIZONA TRYING TO ILLEGALLY ENTER THE UNITED

5  STATES, CORRECT?

6  A.   YES.

7  Q.   YOU GOT CAUGHT?

8  A.   YES.

9  Q.   YOU GOT ARRESTED?

10  A.   YES.

11  Q.   AND THE AGENTS TOOK YOU FROM PHOENIX TO NOGALES,

12  ARIZONA, RIGHT?

13  A.   YES.

14  Q.   AND THEN FROM NOGALES TO TIJUANA, RIGHT?

15  A.   YES.

16  Q.   SO, YOU WERE TOLD NOT TO RETURN TO THE UNITED STATES?

17  A.   YES.

18  Q.   AND YOU DECIDED YOU WANTED TO RETURN ANYWAY, RIGHT?

19  A.   YES.

20  Q.   NOW, THAT SAME THING HAS HAPPENED BEFORE, RIGHT?

21  A.   LIKE WHAT?

22  Q.   BEFORE THE TIME YOU WERE ARRESTED IN ARIZONA, A WEEK

23  BEFORE YOU WERE ARRESTED IN THIS CASE, YOU HAVE BEEN ARRESTED

24  BY IMMIGRATION BEFORE THAT AS WELL, RIGHT?

25  A.   YES.

1   Q.   YOU WERE ARRESTED ON APRIL 9, 2006, RIGHT?

2   A.   I DON'T REMEMBER.

3   Q.   OKAY.  BUT YOU HAVE BEEN ARRESTED BEFORE, RIGHT?

4   A.   YES.

5   Q.   HOW MANY TIMES?

6   A.   TWO MORE TIMES.

7   Q.   TWO MORE TIMES BEFORE THE TIME IN ARIZONA, THE WEEK

8   BEFORE, THIS CASE, RIGHT?

9   A.   YES.

10  Q.   LET'S GO TO MARCH 25TH, OF 2010.  YOU'VE ALREADY

11  EXPLAINED YOU WANTED TO COME TO THE UNITED STATES, RIGHT?

12  A.   YES.

13  Q.   AND YOU DECIDED TO HIRE A SMUGGLER TO HELP YOU ENTER THE

14  UNITED STATES?

15  A.   YES.

16  Q.   AND THE POINT OF HIRING THE SMUGGLER IS THAT PERSON IS A

17  PROFESSIONAL, RIGHT?

18  A.   I DON'T KNOW IF HE'S PROFESSIONAL OR NOT, BUT I JUST

19  KNOW THAT'S WHAT HE DOES TO CROSS PEOPLE.

20  Q.   SO, HE'S SOMEONE -- A SMUGGLER IS SOMEONE YOU CAN HELP

21  GET ACROSS?

22  A.   YES.

23  Q.   THEY KNOW WHERE TO GO?

24  A.   YES.

25  Q.   THEY KNOW WHEN TO GO?

1    A.   YES.

2    Q.   YOU TESTIFIED THAT YOU WENT TO AN AREA IN TIJUANA WITH

3    AN ARCH, DO YOU REMEMBER THAT?

4    A.   YES.

5    Q.   THAT'S LIKE A MAIN DOWNTOWN CENTRAL PART OF TIJUANA, IS

6    THAT RIGHT?

7    A.   YES.

8    Q.   LIKE THERE ARE SHOPS AND RESTAURANTS AND BARS THERE?

9    A.   YES.

10   Q.   THERE IS A LOT OF PEOPLE THERE?

11   A.   YES.

12   Q.   THERE IS A LOT OF PEOPLE THERE WHO ARE OFFERING THERE

13   SERVICES AS SMUGGLERS, RIGHT?

14   A.   YES.

15   Q.   NOW, WHEN YOU WENT TO THE SQUARE, YOU DIDN'T GO ALONE,

16   RIGHT?

17   A.   NO.

18   Q.   YOU WENT WITH MAURO, RIGHT?

19   A.   YES.

20   Q.   IN FACT, HE WAS THE ONE WHO FOUND THE SMUGGLER, RIGHT?

21   A.   YES.

22   Q.   AND BASICALLY TOLD YOU ABOUT HIM, RIGHT?

23   A.   NO.

24   Q.   YOU KNOW THAT HE HAD MADE ARRANGEMENTS WITH THIS

25   SMUGGLER, RIGHT?

```
1    A.   MAURO?

2    Q.   YES.

3    A.   YES.

4    Q.   AND HE MADE THOSE ARRANGEMENTS BEFORE YOU MADE YOUR

5    ARRANGEMENTS, RIGHT?

6    A.   YES.

7    Q.   AND SO, AFTER HE MADE ARRANGEMENTS, HE TOLD YOU ABOUT

8    IT, RIGHT?

9    A.   YES.

10   Q.   BECAUSE HE WAS TRYING TO HELP YOU, TOO?

11   A.   YES.

12   Q.   AND SO, YOU WENT TO THE SAME SMUGGLER, RIGHT?

13   A.   YES.

14   Q.   AND MAURO WAS WITH YOU?

15   A.   YES.

16   Q.   AND YOU WERE BOTH THERE WHEN YOU MADE YOUR ARRANGEMENTS?

17   A.   YES.

18   Q.   LET'S TALK A LITTLE BIT ABOUT MAURO.  YOU TESTIFIED YOU

19   KNEW HIM FROM OAXACA, RIGHT?

20   A.   YES.

21   Q.   HOW LONG DID YOU KNOW HIM?

22   A.   SIX MONTHS, A YEAR.  I DON'T REMEMBER.

23   Q.   SIX MONTHS TO A YEAR BEFORE MARCH OF THIS YEAR?

24   A.   YES.

25   Q.   AND YOU TESTIFIED THAT YOU'RE FROM THIS NEIGHBORING
```

1   RANCH, IS THAT RIGHT?

2   A.   YES.

3   Q.   YOU TRAVELED TO TIJUANA WITH HIM, IS THAT RIGHT?

4   A.   YES.

5   Q.   AND YOU MADE ARRANGEMENTS TOGETHER, RIGHT?

6   A.   YES, IN TIJUANA.

7   Q.   AND IF YOU WERE BOTH SUCCESSFUL, YOU WERE GOING TO GO TO

8   NORTHERN CALIFORNIA TOGETHER, RIGHT?

9   A.   YES.

10  Q.   NOW, YOU TESTIFIED THAT WHEN YOU WERE WALKING ON YOUR

11  WAY INTO THE UNITED STATES, YOU TESTIFIED YOU WERE WALKING

12  WITH MAURO, RIGHT?

13  A.   YES.

14  Q.   AND YOU ALSO TESTIFIED THAT YOU WERE WALKING WITH SOME

15  OTHER FRIENDS AS WELL, RIGHT?

16  A.   YES.

17  Q.   AND I THINK YOU SAID IT WAS FOUR FRIENDS, IS THAT

18  CORRECT?

19  A.   YES.

20  Q.   THESE WERE FOUR FRIENDS WHO YOU KNEW FROM OAXACA, IS

21  THAT RIGHT?

22  A.   YES, THEY WERE FROM OVER THERE TOO.

23  Q.   AND SO, ALL OF YOU TRAVELED TOGETHER TO TRY TO CROSS?

24  A.   NO.

25  Q.   BUT ALL OF YOU TRAVELED FROM OAXACA TO TIJUANA, RIGHT?

```
 1            THE INTERPRETER:  ALL OF, YOU SAID?
 2            MR. FAKHOURY:  YES.
 3            THE WITNESS:  YES, BUT SEPARATE.
 4  BY MR. FAKHOURY:
 5  Q.   SO, YOU ALL KNEW EACH OTHER FROM OAXACA, RIGHT?
 6  A.   YES.
 7  Q.   AND YOU WERE ALL REUNITED TOGETHER IN TIJUANA, RIGHT?
 8  A.   YES, WE MET UP BY CHANCE.
 9  Q.   OKAY.  AND BY CHANCE YOU ALL USED THE SAME PERSON TO
10  BRING YOU INTO THE UNITED STATES, RIGHT?
11  A.   YES.
12  Q.   NOW, LET'S TALK ABOUT SOME OF THE CIRCUMSTANCES THAT
13  WENT INTO THE ACTUAL CROSSING, OKAY.  YOU DON'T HAVE ANY
14  LEGAL PERMISSION TO BE IN THE UNITED STATES, RIGHT?
15  A.   NO.
16  Q.   AND THAT'S WHY YOU HAVE TO CROSS ILLEGALLY, RIGHT?
17  A.   YES.
18  Q.   AND OBVIOUSLY IF YOU GET CAUGHT THEY ARE GOING TO SEND
19  YOU BACK TO MEXICO, RIGHT?
20  A.   YES.
21  Q.   THAT JUST HAPPENED TEN DAYS BEFORE YOUR ARREST IN THIS
22  CASE, RIGHT?
23  A.   YES.
24  Q.   AND YOU ALREADY WENT THROUGH THAT PROCESS ONCE, RIGHT?
25  A.   YES.
```

1   Q.   YOU DIDN'T WANT TO HAVE THAT HAPPEN AGAIN, RIGHT?

2   A.   NO.

3   Q.   SO, OBVIOUSLY YOU HAVE TO CROSS LATE AT NIGHT, RIGHT?

4   A.   YES.

5   Q.   AND YOU HAVE TO CROSS IN AN AREA WHERE THERE IS PLACES

6   TO HIDE, RIGHT?

7   A.   YES.

8   Q.   IN AREAS WHERE THERE AREN'T A LOT OF PEOPLE AROUND?

9   A.   YES.

10   Q.   AND IN AREAS WHERE YOU ULTIMATELY CROSS THROUGH THERE IS

11   NO BORDER FENCE IN THAT AREA, RIGHT?

12   A.   NO.

13   Q.   THERE IS NO STREETLIGHTS THERE, RIGHT?

14   A.   NO.

15   Q.   NO CARS?

16   A.   NO.

17   Q.   NO BUSINESSES?

18   A.   NO.

19   Q.   JUST LITERALLY NOTHING THERE?

20   A.   YES, THERE IS NOTHING THERE.

21   Q.   NOW, WHILE YOU WERE CROSSING WITH THE GROUP THERE WERE

22   TWO GUIDES, CORRECT?

23   A.   YES.

24   Q.   SO, THERE WERE TWO PEOPLE GIVING INSTRUCTIONS, RIGHT?

25   A.   YES.

1   Q.   TWO PEOPLE TELLING YOU WHERE TO GO?

2   A.   YES.

3   Q.   TWO PEOPLE TELLING YOU WHEN TO CROSS?

4   A.   YES.

5   Q.   NOW, YOU TESTIFIED THAT ONCE YOU CROSSED OVER, YOU HID

6   IN A BUSH FOR ABOUT 30 OR 45 MINUTES, DO YOU REMEMBER THAT?

7   A.   YES.

8   Q.   AND AFTER THAT 30 OR 45 MINUTES THE BORDER PATROL FOUND

9   YOU, RIGHT?

10  A.   YES.

11  Q.   AND YOU SAID THAT AFTER YOU STARTED HIDING, YOU COULD

12  SEE THAT THE BORDER PATROL IS COMING CLOSE TO YOUR GROUP,

13  RIGHT?

14  A.   YES.

15  Q.   YOU SAID YOU COULD SEE THE LIGHTS, RIGHT?

16  A.   YES.

17  Q.   AS YOU WERE HIDING YOU WERE SCARED, RIGHT?

18  A.   A LITTLE, MORE OR LESS.

19  Q.   OKAY.  ULTIMATELY THE AGENTS FOUND YOU, RIGHT?

20  A.   YES.

21  Q.   AND THEY TOLD YOU THAT THEY WERE FROM IMMIGRATION,

22  RIGHT?

23  A.   YES.

24  Q.   AND THEY ASKED YOU IF YOU HAD ANY PERMISSION TO BE IN

25  THE UNITED STATES, RIGHT?

1    A.    NO.

2    Q.    THEY DIDN'T ASK YOU THAT?

3    A.    NO, THEY ARRESTED US.  THEY ALREADY KNEW THAT WE HAD NO

4    PAPERS.

5    Q.    SO, THEY DIDN'T ASK YOU ANY QUESTIONS?

6    A.    YES.

7    Q.    WELL, LET ME ASK IT THIS WAY, WHEN YOU WERE ARRESTED IN

8    -- HIDING IN A BUSH, AT THAT TIME, THEY DIDN'T ASK YOU ANY

9    QUESTIONS, RIGHT?

10   A.    NO.

11   Q.    AND YOU DIDN'T GIVE THEM ANY INFORMATION AT THAT TIME,

12   RIGHT?

13   A.    NO.

14   Q.    SO, THEY JUST TOOK YOU OUT OF THE BUSH AND TIED YOUR

15   HANDS, RIGHT?

16   A.    YES.

17   Q.    AND THEY TOOK YOU TO THE STATION?

18   A.    YES.

19   Q.    LET'S TALK ABOUT THAT.  NOW, THEY TOOK YOU OUT OF THE

20   BUSH AND THEY PUT PLASTIC TIES AROUND YOUR HANDS, RIGHT?

21   A.    YES.

22   Q.    AND THEN THEY PUT YOU IN A CAR TO DRIVE YOU BACK TO THE

23   STATION, RIGHT?

24   A.    YES.

25   Q.    AND IT WASN'T JUST YOU THERE, RIGHT?

1    A.    NO.

2    Q.    WAS EVERYBODY ELSE IN THE GROUP AS WELL, RIGHT?

3    A.    YES.

4    Q.    SO, YOU AND 11 OTHER PEOPLE?

5    A.    MORE OR LESS.

6    Q.    OKAY, AND THEY TOOK YOU TO THE STATION, RIGHT?

7    A.    YES.

8    Q.    THEY FINGERPRINTED YOU?

9    A.    YES.

10   Q.    THEY SEPARATED THE MEN AND THE WOMEN, RIGHT?

11   A.    YES.

12   Q.    THEY PUT YOU IN A CELL?

13   A.    YES.

14   Q.    THEY PUT YOU IN A CELL WITH ALL THE OTHER MEN, RIGHT?

15   A.    YES.

16   Q.    AND THEY PUT THE WOMEN IN A DIFFERENT CELL, RIGHT?

17   A.    YES.

18   Q.    AND THAT CELL WAS SMALL, RIGHT?

19   A.    YES.

20   Q.    THERE IS NO WINDOWS IN THAT CELL?

21   A.    I DON'T REMEMBER THAT.

22   Q.    THERE IS NO PHONE THERE, RIGHT?

23   A.    NO.

24   Q.    THERE WAS A TOILET IN THAT CELL, RIGHT?

25   A.    NO.

1   Q.   NO, OKAY.  YOU HAD NO WAY TO OPEN AND CLOSE THE DOOR TO

2   THAT CELL, RIGHT?

3   A.   NO.

4   Q.   IT WAS LOCKED, RIGHT?

5   A.   YES.

6   Q.   IT WAS KIND OF LIKE BEING IN JAIL?

7   A.   YES.

8   Q.   AND YOU SAT THERE, RIGHT?

9   A.   YES.

10   Q.   FOR ALMOST 16 HOURS YOU SAT THERE, RIGHT?

11   A.   YES, MORE OR LESS.  I DON'T REMEMBER.

12   Q.   AGAIN, YOU COULDN'T LEAVE THAT CELL, RIGHT?

13   A.   NO.

14   Q.   AND YOU JUST SAT THERE, RIGHT?

15   A.   YES.

16   Q.   TIRED?

17   A.   A LITTLE.

18   Q.   HUNGRY?

19   A.   A LITTLE.

20   Q.   FRUSTRATED?

21   A.   A LITTLE.

22   Q.   PROBABLY WANTED TO GO HOME, HUH?

23   A.   YES.

24   Q.   AND WHEN YOU ARE SITTING IN THAT CELL, MAURO IS THERE

25   WITH YOU, RIGHT?

1    A.    YES.

2    Q.    AND ANOTHER MAN NAMED GABRIEL GONZALEZ-RAMIREZ WAS WITH

3    YOU TOO, RIGHT?

4    A.    YES.

5    Q.    AND AT SOME POINT, YOU WERE TAKEN OUT OF THE CELL,

6    RIGHT?

7    A.    YES.

8    Q.    BY THE AGENTS, RIGHT?

9    A.    YES.

10   Q.    AND WHEN YOU WERE TAKEN OUT OF THE CELL, IT WAS JUST YOU

11   WHO WAS TAKEN OUT, RIGHT?

12   A.    OH, YES.

13   Q.    THEY DID THE SAME THING WITH MAURO, RIGHT?  THEY TOOK

14   HIM OUT OF THE CELL TOO, RIGHT?

15   A.    I THINK SO.

16   Q.    WHEN THEY TOOK YOU OUT OF THE CELL, THE AGENTS PUT YOU

17   IN A ROOM, RIGHT?

18   A.    YES.

19   Q.    AND THERE WERE TWO AGENTS IN THAT ROOM WITH YOU, RIGHT?

20   A.    YES.

21   Q.    NEITHER OF THOSE AGENTS ARE IN THIS ROOM HERE TODAY, ARE

22   THEY?

23   A.    I DON'T REMEMBER.

24   Q.    IT WASN'T AGENT GUIEB OR AGENT PECHT, THOSE WEREN'T THE

25   TWO AGENTS THAT THE SPOKE WITH YOU, RIGHT?

1   A.   I DON'T REMEMBER.  IT'S BEEN A LONG TIME.

2   Q.   THAT'S FINE.  SO, IT WAS JUST YOU AND THE TWO AGENTS,

3   RIGHT?

4   A.   YES.

5   Q.   SITTING IN THAT SMALL ROOM?

6   A.   YES.

7   Q.   AND THERE WAS A CAMERA IN THAT ROOM, RIGHT?

8   A.   YES.

9   Q.   AND WHEN YOU FIRST GOT INTO THE ROOM, THE CAMERA WASN'T

10  TURNED ON, RIGHT?

11  A.   NO.

12  Q.   WHEN YOU FIRST GOT INTO THAT ROOM, THE AGENTS SAT YOU

13  DOWN, RIGHT?

14  A.   YES.

15  Q.   AND JUST TO BACKTRACK FOR A SECOND, YOU HAD BEEN IN A

16  SIMILAR SITUATION JUST A FEW DAYS -- EIGHT OR TEN DAYS BEFORE

17  IN ARIZONA, RIGHT?

18  A.   YES.

19  Q.   AGENTS HAD TAKEN YOU OUT ON THAT DAY, TOO, RIGHT?

20  A.   YES.

21  Q.   AND THEY HAD SPOKEN TO YOU?

22  A.   YES.

23  Q.   THEY ASKED YOU QUESTIONS?

24  A.   NO.

25  Q.   THEY DIDN'T ASK YOU QUESTIONS IN ARIZONA?

1    A.   IN ARIZONA?

2    Q.   RIGHT.   IN ARIZONA.

3    A.   YES.

4    Q.   SO, THE AGENTS DID ASK YOU QUESTIONS?

5    A.   OH, YES.

6    Q.   OKAY.   THEY WANTED TO KNOW ABOUT HOW YOU GOT SMUGGLED

7    ACROSS, RIGHT?

8    A.   NO, THEY DIDN'T ASK ME ANYTHING -- THE ONES IN ARIZONA,

9    I DON'T REMEMBER WHAT IT WAS THAT THEY ASKED ME.

10   Q.   OKAY.   THAT'S FINE.   LET'S JUMP BACK NOW TO MARCH 25TH,

11   HERE IN SAN DIEGO.   WHEN YOU ARE SITTING IN THE ROOM WITH THE

12   AGENTS, THEY TALKED TO YOU BEFORE THEY TURNED ON THE CAMERA,

13   RIGHT?

14   A.   YES.

15   Q.   AND THEY TOLD YOU THEY WANTED YOU TO IDENTIFY THE GUIDE,

16   RIGHT?

17   A.   YES.

18   Q.   AND THEY TOLD YOU THAT YOU HAD TO IDENTIFY THE GUIDE?

19   A.   YES.

20   Q.   THEY TOLD YOU THEY WERE GOING TO PUT YOU IN JAIL FOR SIX

21   MONTHS IF YOU DIDN'T IDENTIFY THE GUIDE?

22   A.   YES.

23   Q.   AND THEN THEY TURNED ON THE CAMERA, RIGHT?

24   A.   YES, AFTERWARDS.

25   Q.   AND THEN THEY STARTED TO ASK YOU QUESTIONS, RIGHT?

1    A.   YES.

2    Q.   THEY PUT YOU UNDER OATH, RIGHT?

3    A.   YES.

4    Q.   LIKE THE OATH YOU TOOK TODAY, RIGHT?

5    A.   YES.

6    Q.   AND THEY STARTED ASKING THEIR QUESTIONS?

7    A.   YES.

8    Q.   YOU ANSWERED THEM?

9    A.   YES.

10   Q.   THEY ASKED YOU TO TELL WHO THE GUIDE WAS?

11   A.   YES.

12   Q.   YOU ANSWERED THEM?

13   A.   YES.

14   Q.   THEY SHOWED YOU PICTURES?

15   A.   YES.

16   Q.   SHOWED YOU PICTURES OF SIX PEOPLE, RIGHT?

17   A.   YES.

18   Q.   AND YOU IDENTIFIED TWO OF THEM, RIGHT?

19   A.   YES.

20   Q.   AS TWO PEOPLE BEING THERE IN THE GROUP WITH YOU, RIGHT?

21   A.   YES.

22   Q.   I WANT TO TALK TO YOU A LITTLE BIT ABOUT SOME OF THE

23   THINGS YOU SAID ON MARCH 25TH, BUT BEFORE THAT, I WANT TO GO

24   BACK TO WHAT YOU TESTIFIED TODAY, ABOUT ARRANGEMENTS YOU

25   MADE.

1    A.   OKAY.

2    Q.   YOUR TESTIMONY TODAY IS THAT YOU MADE ARRANGEMENTS WITH

3    THE GUIDE, CORRECT?

4    A.   YES.

5    Q.   AND YOU IDENTIFY THAT GUIDE AS MR. LEAL, RIGHT?

6    A.   YES.

7    Q.   SO, YOUR TESTIMONY TODAY IS THAT YOU MADE ARRANGEMENTS

8    WITH MR. LEAL DIRECTLY, RIGHT?

9    A.   YES.

10   Q.   NOW, AS YOU ALREADY EXPLAINED, YOU TALKED TO THE AGENTS

11   AFTER YOU WERE ARRESTED, RIGHT?

12   A.   YES.

13   Q.   AT THE STATION, RIGHT?

14   A.   YES.

15   Q.   THEY WEREN'T THE TWO AGENTS THAT ARRESTED YOU?

16   A.   NO.

17   Q.   THEY WERE TWO DIFFERENT AGENTS, RIGHT?

18   A.   YES.

19   Q.   AND AGAIN, THEY MADE YOU TAKE AN OATH, RIGHT?

20   A.   YES.

21   Q.   TO TELL THE TRUTH?

22   A.   YES.

23   Q.   WHEN YOU SPOKE TO THEM, IT HAD JUST BEEN A DAY OR TWO

24   SINCE YOU MADE THESE ARRANGEMENTS, RIGHT?

25   A.   YES.

```
1    Q.   IT HADN'T BEEN EIGHT MONTHS LIKE IT IS TODAY?

2    A.   NO.

3    Q.   SO, WHEN YOU WERE SPEAKING WITH THEM, THINGS WERE STILL

4    FRESH IN YOUR MIND, RIGHT?

5    A.   YES.

6    Q.   YOUR MEMORY OF WHAT HAPPENED IN MARCH IS BETTER THAN IT

7    IS WHAT HAPPENED IN NOVEMBER, RIGHT?

8    A.   YES.

9    Q.   ON MARCH 25, 2010, WHEN YOU SPOKE TO THE AGENTS, YOU

10   NEVER TOLD THEM THAT YOU MADE ARRANGEMENTS WITH MR. LEAL

11   DIRECTLY, CORRECT?

12   A.   BECAUSE THEY DIDN'T ASK ME.

13   Q.   BUT HE NEVER TOLD THEM THAT, CORRECT?

14        MR. MILLER:  OBJECTION, MISSTATES HIS PRIOR

15   STATEMENT.

16        THE COURT:  OVERRULED.  YOU'RE ON CROSS.  HIS

17   ANSWER STANDS, YOU'RE OKAY.  GO AHEAD.

18   BY MR. FAKHOURY:

19   Q.   ON MARCH 25, 2010, WHEN YOU SPOKE TO THE AGENTS, YOU

20   TOLD THEM THAT IT WAS THE OTHER GUIDE WHO WAS PLACING THE

21   BLANKETS ON THE PATH, CORRECT?

22   A.   I DON'T REMEMBER, I THINK SO.

23   Q.   YOU REMEMBER -- LET'S CLEAN IT UP A LITTLE BIT.  ON

24   MARCH 25TH, YOU TOLD THE AGENTS THAT THE OTHER GUIDE WAS

25   USING THE BLANKET TO CLEAN UP FOOTPRINTS, DO YOU REMEMBER
```

1    SAYING THAT?

2    A.   YES.

3    Q.   AND TODAY YOU SAID THAT IT WAS ONLY MR. LEAL WHO WAS

4    USING THE BLANKET, CORRECT?

5    A.   BECAUSE I WAS NOT ASKED IF IT WAS ONLY ONE OR BOTH OF

6    THEM.

7    Q.   NOW, WHEN YOU WERE ARRESTED IN ARIZONA, ABOUT TEN DAYS

8    BEFORE YOUR ARREST HERE, YOU OBVIOUSLY HAD NO PERMISSION TO

9    BE HERE IN THE UNITED STATES, RIGHT?

10   A.   NO.

11   Q.   AND YOU WERE CHARGED WITH THE CHIME OF ILLEGALLY

12   ENTERING THE UNITED STATES, RIGHT?

13   A.   I DON'T KNOW.

14   Q.   OKAY.  YOU DO KNOW IT'S A CRIME TO ILLEGALLY ENTER THE

15   UNITED STATES, RIGHT?

16   A.   YES.

17   Q.   AND YOU KNOW YOU CAN GO TO JAIL FOR THAT, RIGHT?

18   A.   I DON'T KNOW.

19   Q.   YOU KNOW YOU CAN GO TO JAIL FOR COMMITTING A CRIME,

20   RIGHT?

21   A.   YES.

22   Q.   ON THAT DAY IN MARCH, IN ARIZONA, YOU COMMITTED A CRIME,

23   RIGHT?

24   A.   YES.

25   Q.   AND YOU NEVER GOT CHARGED WITH THAT CRIME, RIGHT?

1    A.   I DON'T KNOW.

2    Q.   YOU DIDN'T GO TO COURT, RIGHT?

3    A.   NO.

4    Q.   AND YOU DIDN'T GO TO JAIL, RIGHT?

5    A.   NO, ONLY AT DETENTION.

6    Q.   RIGHT.  UNTIL THEY COULD SEND YOU BACK TO MEXICO, RIGHT?

7    A.   YES.

8    Q.   OKAY.  AND NOW, ON MARCH 25TH, WHEN YOU WERE ARRESTED,

9    YOU COMMITTED THE SAME CRIME, RIGHT?

10   A.   YES.

11   Q.   BECAUSE YOU ILLEGALLY ENTERED THE UNITED STATES AGAIN,

12   RIGHT?

13   A.   YES.

14   Q.   AND YOU COULD HAVE GONE TO JAIL FOR THAT, RIGHT?

15   A.   YES, I DID.

16   Q.   FOR ABOUT TWO MONTHS, RIGHT?

17   A.   TWO-AND-A-HALF MONTHS.

18   Q.   AND THEN YOU WERE RELEASED, RIGHT?

19   A.   YES, WITH BAIL.

20   Q.   BUT YOU HAVE NEVER BEEN CHARGED WITH THAT CRIME EITHER,

21   RIGHT OF ILLEGALLY ENTERING ON MARCH 25, RIGHT?

22   A.   I DON'T KNOW.

23   Q.   YOU HAVE NEVER HAD TO GO TO COURT TO PLEAD GUILTY OR NOT

24   GUILTY, RIGHT?

25   A.   NO.

1    Q.   I WANT TO JUMP BACK FOR A MINUTE ON MARCH 25.   YOU

2    TALKED WITH THE AGENTS ON THAT DAY, RIGHT?

3    A.   YES.

4    Q.   YOU TOLD THEM MR. LEAL WAS THE GUIDE, RIGHT?

5    A.   YES.

6    Q.   AND ON THAT DATE YOU DIDN'T TELL THEM THAT YOU MADE

7    ARRANGEMENTS WITH MR. LEAL, RIGHT?

8    A.   I DON'T REMEMBER.

9    Q.   LET'S JUMP FORWARD TO THIS LAST MONDAY, NOVEMBER 15.   DO

10   YOU REMEMBER THAT DAY?

11   A.   YES.

12   Q.   YOU SPOKE WITH MR. MILLER, THE PROSECUTOR, RIGHT?

13   A.   YES.

14   Q.   AND AN AGENT WAS THERE WHEN YOU TALKED WITH HIM, RIGHT?

15   A.   I DON'T KNOW.

16   Q.   YOUR ATTORNEY WAS THERE, RIGHT?

17   A.   YES.

18   Q.   AND YOU ALL DISCUSSED YOUR TESTIMONY TODAY, RIGHT?

19   A.   NO, ONLY THE PROSECUTOR.

20   Q.   SO, YOU AND THE PROSECUTOR TALKED ABOUT YOUR TESTIMONY

21   HERE TODAY, RIGHT?

22   A.   YES.

23   Q.   AND HE TOLD YOU TO BE HONEST ABOUT YOUR -- TELL THE

24   TRUTH, RIGHT?

25   A.   YES.

1    Q.   AND AFTER YOU MET WITH HIM, YOUR TESTIMONY TODAY IS THAT

2    YOU MADE ARRANGEMENTS WITH MR. LEAL, RIGHT?

3    A.   YES.

4    Q.   AND BETWEEN MARCH 25 AND TODAY, YOU STILL HAVE NOT BEEN

5    CHARGED WITH ANY CRIMES, RIGHT?

6    A.   I DON'T KNOW.

7    Q.   AGAIN, YOU HAVEN'T GONE TO COURT AND HAD TO SAY GUILTY

8    OR NOT GUILTY, RIGHT?

9    A.   NO.

10   Q.   YOU HAVEN'T HAD A TRIAL LIKE WE ARE HAVING TODAY, RIGHT?

11   A.   NO.

12   Q.   YOU HAVEN'T BEEN DEPORTED, RIGHT?

13   A.   NO.

14   Q.   IN FACT, YOU WALKED INTO COURT TODAY TO TESTIFY, RIGHT?

15   A.   FROM WHERE?

16   Q.   YOU CAME THROUGH THE FRONT DOORS OF THE COURTHOUSE TODAY

17   TO TESTIFY, RIGHT?

18   A.   YES.

19   Q.   YOU'RE NOT IN JAIL ANY MORE, RIGHT?

20   A.   NO.

21   Q.   YOU'RE NOT STUCK IN A JAIL CELL?

22   A.   NO.

23   Q.   YOU HAVEN'T BEEN SENT BACK TO MEXICO LIKE MAURO OR

24   GABRIEL GONZALEZ-RAMIREZ, RIGHT?

25   A.   NO.

1    Q.   YOUR TESTIMONY WASN'T TAKEN IN A DEPOSITION, WITH A

2    VIDEO CAMERA, RIGHT?

3    A.   ONLY IN THE DETENTION.

4    Q.   SO, ON THE DAY YOU WERE ARRESTED THEY TOOK YOUR

5    STATEMENT ON THE VIDEO CAMERA, RIGHT?

6    A.   YES.

7    Q.   OTHER THAN THAT YOU HAVEN'T BEEN IN FRONT OF THE VIDEO

8    CAMERA TO TESTIFY, RIGHT?

9    A.   NO.

10   Q.   AND SINCE MAY OF THIS YEAR, YOU'VE BEEN LIVING HERE IN

11   THE UNITED STATES, RIGHT?

12   A.   YES.

13   Q.   IN SANTA ROSA, CALIFORNIA, RIGHT?

14   A.   YES.

15   Q.   NEAR SAN FRANCISCO?

16   A.   YES.

17   Q.   THAT'S WHERE YOU WANTED TO GO WHEN YOU GOT ARRESTED ON

18   MARCH 25, RIGHT?

19   A.   YES.

20           MR. FAKHOURY:  CAN I HAVE A QUICK MINUTE, YOUR

21   HONOR?

22           THE COURT:  CERTAINLY.

23   BY MR. FAKHOURY:

24   Q.   I WANT TO GO BACK TO SOMETHING YOU SAID, MR. VAZQUEZ.

25   YOU SAID THAT ON MARCH 25TH, THE AGENTS PULLED YOU OUT OF THE

1    CELL TO SPEAK TO YOU, RIGHT?

2    A.   YES.

3    Q.   AND BEFORE THEY TURNED ON THE CAMERA THEY TALKED TO YOU,

4    RIGHT?

5    A.   YES.

6    Q.   AND THEY THREATENED YOU BY SAYING YOU WOULD GO TO JAIL

7    IF YOU DIDN'T IDENTIFY THE FOOT GUIDE, RIGHT?

8          MR. MILLER:  OBJECTION, ASKED AND ANSWERED,

9    REPEATED, ARGUMENTATIVE.

10         THE COURT:  SUSTAINED.

11   BY MR. FAKHOURY:

12   Q.   IN YOUR OWN WORDS, CAN YOU TELL US WHAT THE AGENTS TOLD

13   YOU?

14         MR. MILLER:  OBJECTION, HEARSAY, RELEVANCE, ASKED

15   AND ANSWERED.

16         THE COURT:  OVERRULED.  YOU CAN ANSWER THAT.

17         THE WITNESS:  HOW DID YOU SAY THAT?

18   BY MR. FAKHOURY:

19   Q.   IN YOUR OWN WORDS, WHAT DID THE AGENTS TELL YOU BEFORE

20   THEY TURNED ON THE VIDEO CAMERA?

21   A.   I DON'T REMEMBER EXACTLY BUT -- BUT THEY SAID THAT THEY

22   WERE GOING TO HOLD ME FOR SIX MONTHS IF I DIDN'T TELL THEM --

23   I DON'T REMEMBER WHAT ELSE THEY TOLD ME.

24   Q.   WHEN YOU SAID IF YOU DIDN'T TELL THEM, DIDN'T TELL THEM

25   WHAT?

1    A.   I DON'T REMEMBER WHAT ELSE THEY TOLD ME.  I DON'T KNOW.

2    Q.   THEY TOLD YOU THAT THEY WOULD KEEP YOU IN DETENTION FOR

3    SIX MONTHS IF YOU DIDN'T IDENTIFY THE FOOT GUIDE, IS THAT

4    RIGHT?

5              MR. MILLER:  OBJECTION, ASKED AND ANSWERED.

6              THE COURT:  OVERRULED.  YOU CAN ASK THAT AGAIN.

7              THE WITNESS:  YES.

8              MR. FAKHOURY:  NOTHING FURTHER.  THANK YOU, YOUR

9    HONOR.  THANK YOU.

10             THE COURT:  WE WILL TAKE OUR NOON RECESS, LADIES

11   AND GENTLEMEN.  WE WILL BE IN RECESS UNTIL 1:15.  PLEASE

12   REMEMBER THE ADMONITIONS.  HAVE A NICE LUNCH.  SEE YOU AT

13   1:15.  BEFORE YOU LEAVE, WILL COUNSEL JUST AGREE THAT I CAN

14   REFER TO THE ADMONITIONS RATHER THAN REPEATING IT WHENEVER I

15   RELEASE THEM?

16             MR. FAKHOURY:  SURE.  THAT'S FINE, YOUR HONOR.

17             MR. MILLER:  YES.

18             THE COURT:  OKAY.  SEE YOU AT 1:15.

19                  (NOON RECESS TAKEN.)

20             THE COURT:  GOOD AFTERNOON, LADIES AND GENTLEMEN.

21   THIS IS THE MATTER OF THE UNITED STATES VERSUS JONATHAN

22   LEAL-DEL CARMEN.  THE COURT FINDS COUNSEL ARE PRESENT,

23   MR. LEAL IS PRESENT, THERE ARE NO MEMBERS OF THE JURY PANEL

24   PRESENT.  WE ARE IN SESSION OUTSIDE THE PRESENCE OF THE JURY

25   AT THE REQUEST OF MR. PETERSON.

1        MR. PETERSON:  THE ONLY ISSUE IS WE HAVE A WITNESS

2   WHO'S ONLY GOING TO BE AVAILABLE TODAY FROM 2:30 TO 4:00.  WE

3   ARE GOING TO REQUEST TO CALL HIM OUT OF ORDER, AND MR. MILLER

4   SAYS HE DOESN'T HAVE A PROBLEM.  IT'S A FACT WITNESS.

5        THE COURT:  THAT'S FINE.

6        MR. PETERSON:  FIVE TO TEN MINUTES AT MOST.

7        THE COURT:  THAT'S FINE.

8        MR. MILLER:  I HAVE NO OPPOSITION TO THAT, YOUR

9   HONOR.  I THINK COUNSEL ANTICIPATED DOING IT AFTER A

10  DEPOSITION.  IN LIGHT OF THAT WITNESSES SCHEDULE, I WOULD

11  ALSO HAVE NO OPPOSITION TO PAUSING THE DEPOSITION VIDEO.

12       THE COURT:  WHY DON'T YOU GENTLEMEN WORK THAT OUT

13  AND GIVE ME A HI SIGN AND I WILL LET THE JURORS KNOW WE ARE

14  GOING TO RECESS THE GOVERNMENT'S CASE AND TAKE A DEFENSE

15  WITNESS OUT OF ORDER.  IT WOULDN'T BE A PROBLEM.  I WILL WORK

16  WITH YOU.

17       MR. PETERSON:  THANK YOU, YOUR HONOR.  WE

18  APPRECIATE IT.  THAT WAS IT.

19       THE COURT:  OKAY.  WE ARE IN RECESS.

20            (JURY ENTERS COURTROOM.)

21       THE COURT:  GOOD AFTERNOON, LADIES AND GENTLEMEN.

22  THIS IS THE MATTER OF THE UNITED STATES VERSUS JONATHAN

23  LEAL-DEL CARMEN.  THE COURT FINDS COUNSEL ARE PRESENT,

24  MR. LEAL IS PRESENT, ALL MEMBERS OF THE JURY PANEL ARE

25  PRESENT.  MR. VAZQUEZ REMAINS ON THE WITNESS STAND.  YOU'RE

1    STILL UNDER OATH FROM THIS MORNING, OKAY, SIR?

2              THE WITNESS:  YES.

3              THE COURT:  MR. MILLER, REDIRECT?

4                    **REDIRECT EXAMINATION**

5    **BY MR. MILLER:**

6    Q.   YOU WERE ASKED A SERIES OF QUESTIONS ABOUT YOUR

7    RELATIONSHIP WITH MAURO.  DID YOU FLY WITH MAURO FROM OAXACA

8    TO TIJUANA TWO WEEKS BEFORE YOU WERE CAUGHT IN THIS CASE?

9    A.   NO.

10   Q.   AND THE FRIENDS THAT YOU SAID THAT YOU KNEW FROM OAXACA

11   THAT WERE IN THIS GROUP, DID YOU TRAVEL WITH ANY OF THEM WHEN

12   YOU DECIDED TO COME TO THE UNITED STATES AND ARRIVED IN

13   TIJUANA?

14   A.   NO.

15   Q.   THERE WAS A SERIES OF QUESTIONS ABOUT YOUR APPREHENSION

16   IN ARIZONA.  JUST TO BE CLEAR, THE PEOPLE WITH WHOM YOU MADE

17   ARRANGEMENTS TO BE SMUGGLED DURING THE ARIZONA TRIP WAS

18   DIFFERENT THAN IN THIS CASE?

19   A.   YES.

20   Q.   AND WHEN YOU WERE BEING BROUGHT TO THE UNITED STATES IN

21   THE ARIZONA INCIDENT, WERE YOU SMUGGLED WITH MAURO OR ANY OF

22   THE OTHER FOUR FRIENDS?

23   A.   NO.

24   Q.   NOW, WHEN YOU WERE APPREHENDED IN THIS CASE, YOU WERE

25   HELD AS A MATERIAL WITNESS FOR THE PROSECUTION, RIGHT?

1    A.   YES.

2    Q.   AND WHEN YOU WERE HELD AS A MATERIAL WITNESS, A MATERIAL

3    WITNESS ATTORNEY WAS APPOINTED FOR YOU, RIGHT?

4             MR. FAKHOURY:  OBJECTION, RELEVANCE.

5             THE COURT:  OVERRULED.

6             THE WITNESS:  YES.

7    BY MR. MILLER:

8    Q.   ALL RIGHT.  DID HE GIVE AN AUDIBLE ANSWER BEFORE HE

9    TRANSLATED THAT?

10   A.   (INTERPRETER, YES, HE DID.)

11   Q.   AND IS YOUR MATERIAL WITNESS ATTORNEY PRESENT IN COURT?

12   A.   YES.

13   Q.   WOULD YOU PLEASE POINT HIM OUT AND DESCRIBE AN ARTICLE

14   OF CLOTHING THAT HE IS WEARING?

15   A.   HE HAS A SUIT, A TIE AND A WHITE SHIRT.

16   Q.   THE GENTLEMAN IN THE GALLERY WITH WHITE HAIR?

17   A.   YES.

18             MR. MILLER:  MAY THE RECORD REFLECT HE IDENTIFIED

19   THOMAS GILMORE.

20             THE COURT:  IT MAY SO REFLECT.

21   BY MR. MILLER:

22   Q.   AFTER YOU WERE APPREHENDED IN THIS CASE, DID YOU REMAIN

23   IN CUSTODY UNTIL YOUR ATTORNEY POSTED BAIL?

24   A.   YES.

25   Q.   AND HOW LONG DID YOU REMAIN IN CUSTODY UNTIL BAIL WAS

1    POSTED?

2    A.   MORE OR LESS ABOUT TWO MONTHS-AND-A-HALF.

3    Q.   AFTER YOU WERE RELEASED ON BOND, BETWEEN THEN AND YOUR

4    TESTIMONY HERE TODAY, WERE YOU LIVING IN THE UNITED STATES?

5    A.   YES.

6    Q.   WHERE?  AND DON'T GIVE AN ADDRESS, JUST A TOWN.

7    A.   SANTA ROSA.

8    Q.   AND AFTER YOUR TESTIMONY HERE TODAY, ARE YOU EXPECTING

9    TO BE REMOVED BACK TO MEXICO?

10   A.   MAYBE, YES.

11   Q.   UNTIL YOUR ORDER FOR YOU TO TESTIFY HERE TODAY, DID YOU

12   HAVE TO TRAVEL FROM SANTA ROSA TO SAN DIEGO?

13   A.   YES.

14   Q.   NOW, WE MET FOR THE FIRST TIME LAST MONDAY, DIDN'T WE?

15   A.   YES.

16   Q.   AND IN ADDITION TO YOU AND ME, THERE WAS AN INTERPRETER

17   AND YOUR ATTORNEY, RIGHT?

18           MR. FAKHOURY:  OBJECTION, LEADING.

19           THE COURT:  OVERRULED.  IT'S FOUNDATIONAL.

20           THE WITNESS:  YES.

21   BY MR. MILLER:

22   Q.   WAS PART OF OUR DISCUSSION, IN ADDITION TO ASKING

23   QUESTIONS ABOUT THIS CASE, HAD TO DO WITH YOUR LODGING WHILE

24   STAYING IN SAN DIEGO DURING THIS TRIAL?

25           MR. FAKHOURY:  OBJECTION, LEADING, CALLS FOR

1   HEARSAY.

2         THE COURT:  OVERRULED.  YOU CAN ANSWER THAT, JUST

3   YES OR NO.

4         THE WITNESS:  YES.

5   BY MR. MILLER:

6   Q.   NOW, IN ANTICIPATION OF HAVING YOU TESTIFY AT THIS

7   TRIAL, DID YOU WATCH A VIDEO OF YOUR STATEMENT TO THE BORDER

8   PATROL THAT YOU MADE ON MARCH 25TH?

9   A.   YES.

10  Q.   AND YOU WERE ASKED A SERIES OF QUESTIONS ABOUT WHAT YOU

11  SAID AND DID NOT SAY ON CROSS EXAMINATION?

12  A.   YES.

13  Q.   WHEN YOU WERE INTERVIEWED BY THE BORDER PATROL, DID YOU

14  IDENTIFY TWO PEOPLE WHO HAD BEEN ACTING AS YOUR GUIDES FROM A

15  PHOTO LINEUP?

16  A.   YES.

17  Q.   AND WAS ONE OF THE PEOPLE THAT YOU IDENTIFIED AT THE

18  TIME THAT YOU WERE INTERVIEWED BY THE BORDER PATROL, THE

19  DEFENDANT IN THIS CASE?

20  A.   YES.

21  Q.   AND WHERE DID YOU TELL THE BORDER PATROL THE FIRST TIME

22  YOU MET THE DEFENDANT BACK ON MARCH 25TH?

23         MR. FAKHOURY:  OBJECTION, CALLS FOR HEARSAY.

24         THE COURT:  OVERRULED.

25         THE WITNESS:  IN THE ARCH.

1   BY MR. MILLER:

2   Q.   AND WHERE -- WHAT DID YOU TELL THE BORDER PATROL ABOUT

3   WHERE YOU SAW THE OTHER GUIDE THAT YOU PICKED OUT OF THE

4   PHOTOS FOR THE FIRST TIME?

5             MR. FAKHOURY:  OBJECTION, YOUR HONOR, CALLS FOR

6   HEARSAY, IMPROPER BOLSTERING AND BEYOND THE SCOPE AS TO THIS

7   QUESTION.

8             THE COURT:  OVERRULED.  IT'S HEARSAY.  HE IS THE

9   DECLARANT.

10             THE WITNESS:  THAT THE OTHER GUIDE HAD ARRIVED IN

11   TECATE WHERE ALL OF US HAD GATHERED.

12   BY MR. MILLER:

13   Q.   NOW, WOULD IT BE FAIR TO SAY OF THE QUESTIONS THAT I

14   HAVE ASKED YOU TODAY, AND THE QUESTIONS I ASKED YOU ON MONDAY

15   WERE IN A LITTLE BIT MORE DETAIL THAN WHAT THE BORDER PATROL

16   ASKED YOU ON MARCH 25TH?

17             MR. FAKHOURY:  OBJECTION, YOUR HONOR, LEADING AND

18   BOLSTERING, IMPROPER BOLSTERING.

19             THE COURT:  OVERRULED.

20             THE WITNESS:  YES.

21   BY MR. MILLER:

22   Q.   NOW, DURING YOUR INTERVIEW WITH THE BORDER PATROL ON

23   MARCH 25TH, DID THEY ASK YOU WHETHER OR NOT THE PEOPLE WHO

24   WERE GUIDING YOU TREATED YOU BADLY?

25             MR. FAKHOURY:  OBJECTION, BEYOND THE SCOPE AND

1    CALLS FOR HEARSAY.

2              THE COURT:  OVERRULED.  YOU'RE THE ONE THAT BROUGHT

3    UP, THE VIDEOTAPE ON 3-25.  THAT'S PROPER REDIRECT.

4              THE WITNESS:  WHAT WAS THE QUESTION, PLEASE?

5    BY MR. MILLER:

6    Q.   DO YOU REMEMBER IF THE BORDER PATROL ASKED YOU IN YOUR

7    STATEMENT ON MARCH 25TH, WHETHER OR NOT EITHER OF THE GUIDES

8    WERE AGGRESSIVE OR TREATED YOU BADLY?

9    A.   YES.

10   Q.   AND DO YOU REMEMBER WHAT YOUR ANSWER TO THAT QUESTION

11   WAS?

12   A.   YES.

13   Q.   WHAT DID YOU TELL THE BORDER PATROL ON MARCH 25TH ABOUT

14   HOW THE GUIDES TREATED YOU?

15             MR. FAKHOURY:  OBJECTION, HEARSAY.  IT'S IMPROPER

16   REHABILITATION OR TRYING TO REHABILITATE BASED ON -- TRYING

17   TO SET UP A PRIOR INCONSISTENT STATEMENT.  THIS IS ALL BEYOND

18   THE SCOPE.

19             THE COURT:  OVERRULED.

20             THE WITNESS:  THAT THEY HAD NOT MISTREATED ME.

21   BY MR. MILLER:

22   Q.   YOU WERE ALSO ASKED A QUESTION ABOUT THE OTHER GUIDE AND

23   THE BLANKETS, DO YOU REMEMBER THAT PORTION OF YOUR VIDEOTAPED

24   STATEMENT?

25   A.   NO, VERY LITTLE.

1    Q.   DO YOU REMEMBER THE BORDER PATROL AGENT ASKING YOU ABOUT

2    ANYONE ERASING THE PRINTS?

3    A.   YES.

4    Q.   AND WHAT DID YOU TELL THE BORDER PATROL IN YOUR VIDEO

5    STATEMENT?

6              MR. FAKHOURY:  SAME OBJECTION, CALLS FOR HEARSAY.

7              THE COURT:  OVERRULED.

8              THE WITNESS:  THAT I HADN'T SEEN WHO HAD ERASED

9    THEM BECAUSE I WAS WAY AHEAD.

10   BY MR. MILLER:

11   Q.   WELL, DURING YOUR VIDEO STATEMENT WERE YOU NOT ASKED

12   WORDS TO THE EFFECT, BY THE AGENT, "AND YOU SAW HIM ERASE

13   PRINTS ON THE PATH"?

14   A.   NO.

15   Q.   DID YOU NOT TELL THE BORDER PATROL AGENT THAT THE ONLY

16   PERSON YOU SAW ERASING THE PRINTS WAS THE OTHER GUIDE, OTHER

17   THAN THE DEFENDANT?

18   A.   I DON'T REMEMBER.

19   Q.   BUT DO YOU REMEMBER WHETHER OR NOT THAT WAS THE ONLY

20   PORTION IN YOUR VIDEOTAPED STATEMENT ON THE 25TH THAT HAD

21   ANYTHING TO DO WITH BLANKETS?

22   A.   YES.

23             MR. MILLER:  NO FURTHER QUESTIONS.

24             THE COURT:  RECROSS?

25             MR. FAKHOURY:  NO, YOUR HONOR.  THANK YOU.

```
1              THE COURT:  MAY THE WITNESS BE EXCUSED?
2              MR. MILLER:  YES.
3              MR. FAKHOURY:  YES, YOUR HONOR.
4              THE COURT:  THANK YOU VERY MUCH, SIR.
5                   (WITNESS EXCUSED.)
6              MR. MILLER:  THE GOVERNMENT NEXT CALLS, DRYING
7    PAINT, WE HAVE THE DEPOSITIONS TO PLAY.
8              THE COURT:  DO YOU WANT TO MARK -- WHO'S ARE YOU
9    GOING TO MARK FIRST?
10             MR. MILLER:  THAT WILL BE MAURO RODRIGUEZ -- MAURO
11   RAMIREZ-JARQUIN.
12             THE COURT:  MARK THAT AS GOVERNMENT'S 2.  DO YOU
13   HAVE A TRANSCRIPT FOR THE JURY?
14             MR. MILLER:  YES, I DO.
15             THE COURT:  LADIES AND GENTLEMEN OF THE JURY, YOUR
16   ABOUT TO LISTEN TO A VIDEOTAPE RECORDING THAT'S BEEN RECEIVED
17   INTO EVIDENCE.  PLEASE LISTEN TO IT VERY CAREFULLY.  EACH OF
18   YOU WILL BE GIVEN A TRANSCRIPT OF THE RECORDING TO HELP YOU
19   IDENTIFY SPEAKERS AND AS A GUIDE TO LISTEN TO THE VIDEO.
20   HOWEVER, BEAR IN MIND THE VIDEO RECORDING IS THE EVIDENCE,
21   NOT THE TRANSCRIPT.  IF YOU HEAR SOMETHING DIFFERENT FROM
22   WHAT APPEARS IN THE TRANSCRIPT, WHAT YOU HEAR IS CONTROLLING.
23   AFTER THE TAPE IS PLAYED, THE TRANSCRIPT WILL BE TAKEN FROM
24   YOU.
25             ALSO, YOU WILL NOT BE ABLE TO VIEW THE VIDEO AFTER
```

1    IT'S PLAYED DURING THE COURSE OF THE TRIAL.  DURING THE

2    VIEWING OF THE VIDEO, YOU ALSO MAY NOTICE THAT THERE ARE

3    BLANK AREAS ON THE TRANSCRIPTS, AND THERE MAY WELL BE

4    PORTIONS OF THE VIDEO THAT ARE NOT PLAYED.  DO NOT PLACE ANY

5    SIGNIFICANCE UPON WHAT WAS REMOVED FROM THE VIDEO.  THE

6    PARTIES AND COURT HAVE DECIDED TO REMOVE PORTIONS OF THE

7    VIDEO NOT RELEVANT IN THIS CASE AND SHOULD NOT BE CONSIDERED

8    BY YOU FOR ANY REASON.

9            DO YOU HAVE A COPY FOR THE INTERPRETER, MR. MILLER?

10           MR. MILLER:  YES, JUST A MOMENT.

11           THE COURT:  JUST FOR THE RECORD, MR. FAKHOURY, NO

12   OBJECTION TO GOVERNMENT'S TWO, OR MR. PETERSON?

13           MR. FAKHOURY:  NO, YOUR HONOR.

14               (GOVERNMENT'S EXHIBIT NO. 2

15                ADMITTED INTO EVIDENCE.)

16           THE COURT:  TWO IS RECEIVED.

17           MR. MILLER:  ARE WE ABLE TO TURN OUT THAT PORTION

18   OF THE LIGHTS?

19           THE COURT:  IS THAT WHAT YOU WANT?

20           MR. MILLER:  WITH ENOUGH LIGHT FOR PEOPLE TO BE

21   ABLE TO READ.

22           THE COURT:  WE CAN DO IT FROM OUT IN THE HALL AND

23   SHUT OFF JUST HALF-A-BANK.

24           MR. MILLER:  YES.  I KNOW SOME OF THE COURT'S HAVE

25   BEEN ABLE TO DO THAT.

 1          THE COURT:  WE ARE A FULL SERVICE COURT.

 2                    (VIDEOTAPE PLAYING.)

 3          MR. PETERSON:  THIS IS THE TIME WHEN WE ARE HOPING

 4   TO RECESS THE GOVERNMENT'S CASE AND CALL THE WITNESS OUT OF

 5   ORDER.  MIGHT I ALSO SUGGEST TO TAKE THE AFTERNOON BREAK TO

 6   GET THE SECOND INTERPRETER BACK?

 7          THE COURT:  THAT'S FINE.  WE WILL TAKE OUR

 8   AFTERNOON RECESS, LADIES AND GENTLEMEN.  WE WILL BE IN RECESS

 9   FOR 15 MINUTES.  PLEASE REMEMBER THE ADMONITIONS.  DON'T

10   DISCUSS THE CASE AMONG YOURSELVES OR ALLOW ANYONE TO DISCUSS

11   IT WITH YOU.  DON'T FORM OR EXPRESS ANY OPINIONS UNTIL WE

12   HAVE FINALLY SUBMITTED IT TO YOU.  SEE YOU IN 15 MINUTES.

13                    (AFTERNOON RECESS TAKEN.)

14                    (JURY ENTERS COURTROOM.)

15          THE COURT:  THANK YOU.  GOOD AFTERNOON, AGAIN,

16   LADIES AND GENTLEMEN.  THIS IS THE MATTER OF THE UNITED

17   STATES VERSUS JONATHAN LEAL-DEL CARMEN.  THE COURT FINDS ALL

18   ATTORNEYS ARE PRESENT.  MR. LEAL IS PRESENT, ALL MEMBERS OF

19   THE JURY PANEL ARE PRESENT.

20            AT THIS TIME, WE ARE GOING TO INTERRUPT THE

21   GOVERNMENT'S CASE-IN-CHIEF TO ALLOW A DEFENSE WITNESS OUT OF

22   ORDER.  THE REASON FOR THAT, WE ARE HAVING A SCHEDULING

23   PROBLEM AND WE ARE DOING THAT TO ACCOMMODATE THE WITNESS.  GO

24   AHEAD.

25          MR. PETERSON:  YOUR HONOR, THE DEFENSE CALLS CESAR

1    CHAVEZ.

2                                    (WITNESS SWORN.)

3            THE COURT:  GOOD AFTERNOON, SIR.  HOW ARE YOU?

4            THE WITNESS:  GOOD.  HOW ARE YOU DOING?

5            THE COURT:  GOOD.

6            MADAM CLERK:  COULD YOU STATE YOUR NAME AND SPELL

7    YOUR LAST NAME, PLEASE.

8            THE WITNESS:  SURE.  MY NAME IS JULIO C.  CHAVEZ,

9    LAST NAME SPELLED C-H-A-V-E-Z.

10                      **JULIO CESAR CHAVEZ**

11   CALLED AS A WITNESS HEREIN, HAVING BEEN FIRST DULY SWORN WAS

12   EXAMINED AND TESTIFIED AS FOLLOWS:

13                      **DIRECT EXAMINATION**

14   **BY MR. PETERSON:**

15   Q.   THANK YOU.  MR. CHAVEZ, WHERE DO YOU LIVE?

16   A.   I LIVE IN RAMONA, CALIFORNIA.

17   Q.   AND WHERE DO YOU WORK AT?

18   A.   CONSTRUCTION, PAINTING COMPANY.

19   Q.   IN JUST ONE MOMENT I'M GOING TO GET TO HOW YOU KNOW MR.

20   LEAL, BEFORE I WANT TO ASK YOU JUST A FEW BACKGROUND

21   QUESTIONS SO THE JURY CAN KNOW A LITTLE BIT ABOUT YOU.  HOW

22   LONG HAVE YOU LIVED IN THE UNITED STATES?

23   A.   I'D SAY ALMOST 20 YEARS.

24   Q.   WHAT IS YOUR LEGAL STATUS HERE IN THE UNITED STATES?

25   A.   IT'S RESIDENT, LEGAL RESIDENT.

1   Q.   OKAY.  DOES THAT MEAN THAT YOU WENT THROUGH SOME SORT OF

2   PROCESS TO BE HERE LEGALLY?

3   A.   YES, VERY HARD PROCESS.

4   Q.   AND THAT BASICALLY MEANS YOU ARE ALLOWED TO LIVE IN THE

5   UNITED STATES AND COME AND GO FREELY, IS THAT CORRECT?

6   A.   THAT'S CORRECT.

7   Q.   DO YOU HAVE FAMILY HERE IN THE UNITED STATES?

8   A.   YES, YES.

9   Q.   AND WHO'S YOUR FAMILY?

10  A.   MY SON CESAR, MY DAUGHTER STEPHANIE, AND MY WIFE, EMILY.

11  Q.   DO YOU KNOW MY CLIENT, JONATHAN LEAL-DEL CARMEN?

12  A.   YES, I DO.

13  Q.   WOULD YOU PLEASE TELL THE JURY HOW YOU KNOW MR. LEAL?

14  A.   I MET HIM 20 YEARS AGO IN TIJUANA.  HE USED TO WORK AT

15  THE SAME PLACE I USED TO WORK.

16  Q.   WHAT PLACE WAS THAT?

17  A.   HE WAS LIKE -- HE WAS IN, I DON'T KNOW.

18          THE INTERPRETER:  AT A MARKET.

19  BY MR. PETERSON

20  Q.   DO YOU KNOW IF MY CLIENT, MR. LEAL, HAS EVER LIVED IN

21  THE UNITED STATES?

22  A.   YEAH, HE DOES.

23  Q.   WHERE DOES HE LIVE AT IN THE UNITED STATES?

24  A.   MORE SO HE LIVE IN RAMONA WITH US.  HE IS PART OF THE

25  FAMILY BECAUSE HE WAS A ROOMMATE WITH MY BROTHER AND HE IS

1    FAMILY.

2    Q.    OKAY.  HOW LONG HAS HE LIVED WITH YOUR BROTHER?

3    A.    HOW LONG?

4    Q.    CORRECT.

5    A.    IN THE PAST 20 YEARS, I WOULD SAY MAYBE LIKE SEVEN,

6    EIGHT YEARS.

7    Q.    BASED ON YOUR PERSONAL KNOWLEDGE OF MR. LEAL-DEL CARMEN,

8    DO YOU KNOW WHAT SORT OF WORK HE DOES?

9    A.    YEAH, HE DO LABOR CONSTRUCTION.

10   Q.    WHAT DO YOU MEAN BY LABOR, MORE SPECIFICALLY?

11   A.    HE IS LOOKING FOR WORK IN THE STREETS.  NORMALLY WITH

12   ALL THE MEXICANS, HE DOESN'T HAVE PAPERS.  HE WILL STOP BY

13   MAYBE ON A CORNER OF THE HOME DEPOT.  BUT IN THIS CASE, IN

14   RAMONA, HE IS IN THE FRONT OF THE DONUT SHOP.

15   Q.    WHAT KIND OF JOBS DOES HE PICK UP?

16   A.    NORMALLY HE DO LABOR, LANDSCAPE LABOR, CONSTRUCTION

17   LABOR.  AS FAR AS I KNOW, THAT'S ALL HE DOES.

18   Q.    NOW, YOU MENTIONED YOU KNOW MR. LEAL LIVES IN THE UNITED

19   STATES.  TO BE MORE PARTICULAR, DO YOU KNOW THE ADDRESS THAT

20   HE LIVES AT?

21   A.    YEAH, HE IS MY BROTHER'S ADDRESS 1707 **** STREET, I'M

22   NOT SURE THE UNIT NUMBER.

23   Q.    BUT WHEN YOU SAY UNIT NUMBER, IS IT A HOUSE OR APARTMENT

24   BUILDING?

25   A.    OH, IT'S AN APARTMENT.

1    Q.   WHO ALL LIVES AT THAT APARTMENT WITH MR. LEAL?

2    A.   MY BROTHER AND HIS FAMILY.  HE IS MARRIED AND ALSO HE

3    HAS THREE CHILD'S.

4    Q.   OKAY.  NOW, I WANT TO DISCUSS WITH YOU THE LAST TIME

5    THAT YOU SAW MR. LEAL IN THE UNITED STATES BEFORE HIS ARREST.

6    DID YOU SEE MR. LEAL IN THE UNITED STATES SOMETIME AROUND THE

7    BEGINNING OF THIS YEAR?

8    A.   YES, I AM --

9    Q.   AND WHERE DID YOU SEE HIM?

10   A.   I SEE HIM AT MY BROTHER'S APARTMENT.  I CAME THERE AND

11   VISIT MY BROTHER AND WHEN I SEE MR. LEAL, HE IS SUPPOSED TO

12   BE LEAVING TO MEXICO.

13   Q.   DID HE STATE WHAT HE INTENDED TO DO IN THE FUTURE WHEN

14   HE WENT TO MEXICO?

15   A.   YEAH.

16              MR. MILLER:  OBJECTION, HEARSAY.

17              MR. PETERSON:  YOUR HONOR, 803.3, PRESENT FUTURE

18   INTENT.

19              THE COURT:  OVERRULED.

20   BY MR. PETERSON:

21   Q.   DID HE TELL YOU WHAT HE INTENDED TO DO IN THE FUTURE

22   WHEN HE WENT TO MEXICO?

23   A.   YEAH, HE SAID HE IS SUPPOSED TO BE GOING TO VISIT HIS

24   DAUGHTER IN MEXICO.

25   Q.   DID IT SEEM OUT OF THE ORDINARY THAT MR. LEAL WAS

1   RETURNING TO MEXICO?

2   A.   NO.   BECAUSE HE ALWAYS DID THAT.

3   Q.   AND WHAT DID YOU TELL HIM WHEN HE TOLD YOU THIS THAT HE

4   WAS RETURNING TO MEXICO TO SEE HIS DAUGHTER?

5   A.   I SAID GOOD LUCK.   AND THAT'S ALL I SAID.   GOOD LUCK AND

6   THAT'S IT.

7   Q.   DID YOU EVER TALK TO HIM DURING THE TIME THAT HE WAS IN

8   MEXICO THIS YEAR?

9   A.   NO, I DON'T.

10  Q.   AND DID YOU EVENTUALLY FIND OUT THAT HE HAD BEEN

11  ARRESTED?

12  A.   YEAH, WHEN HE CALLED MY HOUSE AND I TELL HIM AND SAY I

13  GOT -- I WAS IN A LEASE OF THE VISITORS BECAUSE HE WAS

14  ARRESTED.   THAT'S ABOUT IT.

15          MR. PETERSON:   THANK YOU VERY MUCH.   I HAVE NO

16  FURTHER QUESTIONS.

17          THE COURT:   OKAY.   CROSS EXAMINATION?

18                     **CROSS EXAMINATION**

19  **BY MR. MILLER:**

20  Q.   YOU'VE KNOWN THE DEFENDANT FOR ABOUT 20 YEARS?

21  A.   YES.

22  Q.   AND YOU ARE AWARE, YOU KNOW OF HIM LIVING IN THE UNITED

23  STATES FOR SEVEN YEARS?

24  A.   I WOULD SAY SEVERAL YEARS.

25  Q.   SEVERAL YEARS?

1    A.    UH-HUH.

2    Q.    ALL RIGHT.  HOW MANY DAYS BEFORE YOU LEARNED THAT HE HAD

3    BEEN APPREHENDED DID YOU SEE HIM AT YOUR BROTHER'S HOME?

4    A.    I WOULD ALMOST ALWAYS SEE HIM THERE BECAUSE HE WAS LIKE

5    PART OF THE FAMILY.

6    Q.    SO, YOU GO TO YOUR BROTHER'S HOUSE AND HE WOULD BE

7    THERE?

8    A.    PERFECT, YES.

9    Q.    AND YOU ARE AWARE OF THE TIMES THAT HE WOULD GO TO

10   MEXICO ALL OF THE TIME?

11   A.    IF I REGULARLY -- I WOULD FIND OUT, AND IF I FOUND OUT

12   THAT HE WAS GOING TO MEXICO, YES.

13   Q.    AND YOU SAID THAT THE LAST TIME THAT YOU SAW HIM HE SAID

14   HE WAS GOING TO GO TO MEXICO?

15   A.    YES.

16   Q.    WHEN WAS THAT?

17   A.    IT WAS BEGINNING OF JANUARY OR RATHER THE END OF JANUARY

18   OR BEGINNING OF FEBRUARY.

19   Q.    AND YOU ARE IN THE CONSTRUCTION BUSINESS?

20   A.    YES.

21   Q.    AND ARE YOU A LICENSED CONTRACTOR?

22   A.    NO.

23          MR. PETERSON:  OBJECTION, YOUR HONOR, OVERRULED.

24          THE COURT:  OVERRULED.

25

1   BY MR. MILLER:

2   Q.   ARE YOU AN APPRENTICED PAINTER?

3   A.   I'M A PAINTER AND I WORK FOR A COMPANY.

4   Q.   AND FOR YOU TO BE A PAINTER, DO YOU NEED TO GO THROUGH

5   AN APPRENTICE PROCESS?

6   A.   YES.

7   Q.   WOULD IT BE FAIR TO SAY THAT AN APPRENTICED PAINTER

8   MAKES MORE THAN DAY LABORERS, LIKE PEOPLE WHO HANG OUT AT A

9   HOME DEPOT?

10  A.   ALMOST ALWAYS IT'S THE SAME.  IT'S A MINIMUM SALARY.

11  Q.   THE SHORT AND LONG OF IT IS DAY LABORERS DON'T MAKE A

12  LOT OF MONEY, DO THEY?

13          MR. PETERSON:  I'M GOING TO OBJECT, YOUR HONOR,

14  RELEVANCE AND POVERTY EVENTS.

15          THE COURT:  SUSTAINED.

16  BY MR. MILLER:

17  Q.   YOU SAID THAT THE DEFENDANT GOES TO MEXICO QUITE A BIT,

18  DIDN'T YOU?

19  A.   DURING THE COURSE OF THE LAST 20 YEARS NOT VERY OFTEN,

20  BUT HE DID GO A FEW TIMES, SEVERAL TIMES.

21  Q.   AND WHEN HE TOLD YOU, I'M GOING TO GO TO MEXICO IN

22  FEBRUARY -- OR JANUARY/FEBRUARY, YOU SAID GOOD LUCK BECAUSE

23  YOU KNEW THAT HE WAS AN UNDOCUMENTED ALIEN?

24  A.   OF COURSE.

25  Q.   AND AS SOMEONE WHO HAS LEGAL RESIDENCY HERE, YOU ALSO

1    KNOW THAT SOMEONE WHO DOES NOT HAVE DOCUMENTS TO REMAIN IN

2    THE UNITED STATES ARE COMMITTING A CRIME?

3    A.   OF COURSE.

4    Q.   DO YOU HAVE RELATIVES IN MEXICO?

5             MR. PETERSON:  YOUR HONOR, OBJECTION, RELEVANCE.

6             THE COURT:  SUSTAINED.

7    BY MR. MILLER:

8    Q.   WHEN YOU CROSSED THE INTERNATIONAL BORDER, YOU HAVE

9    PAPERS THAT ALLOW YOU TO GO INTO THE UNITED STATES, RIGHT?

10   A.   YES.

11   Q.   AND DID THE DEFENDANT EVER TELL YOU HOW HE CAME INTO THE

12   UNITED STATES?

13   A.   THE ONLY THING I KNOW IS THAT HE CROSSED THROUGH THE

14   HILLS.

15   Q.   DID HE EVER TELL YOU HOW HE MADE ARRANGEMENTS TO DO

16   THAT?

17   A.   NO.  NO, I NEVER KNEW ABOUT THAT.

18   Q.   DID HE EVER TELL YOU HOW MUCH IT COST TO BE BROUGHT TO

19   THE UNITED STATES?

20   A.   NOT THAT I KNOW OF.

21   Q.   DID YOU EVER HAVE TO PAY SOMEONE FOR SMUGGLING YOUR

22   FRIEND INTO THE UNITED STATES?

23   A.   ME?  PERSONALLY?

24   Q.   YES.

25   A.   NO.

1    Q.   AND DO YOU KNOW WHETHER OR NOT YOUR BROTHER EVER PAID TO

2    HAVE YOUR FRIEND BROUGHT TO THE UNITED STATES?

3    A.   NO, NOT THAT I KNOW OF EITHER.

4    Q.   AND HE LIVES WITH YOUR BROTHER IN, IS IT, THE LOS

5    ANGELES AREA?

6    A.   NO, I SAID IN SAN DIEGO AND NORTH -- IN RAMONA, THAT'S

7    NORTHEAST OF SAN DIEGO.

8    Q.   OH, I APOLOGIZE.  I THOUGHT YOU SAID THE STREET WAS

9    ****?

10   A.   YES, THE STREET IS CALLED ****.

11   Q.   I APOLOGIZE.  I GOT CONFUSED WITH THE LOS ANGELES ****.

12   A.   OKAY.

13          Q.   AND HE WOULD GO TO MEXICO BECAUSE THAT'S WHERE

14   HIS FAMILY IS?

15   A.   HE HAS A DAUGHTER THERE WHO NOW, I THINK, SHE IS 13 OR

16   14, AND HIS WIFE.

17   Q.   AND YOU AND YOUR BROTHER ARE NOT RELATED TO THE

18   DEFENDANT?

19   A.   NO, WE'RE JUST FRIENDS.

20   Q.   SO, WHEN HE IS IN THE UNITED STATES, HE'S NOT STAYING

21   WITH HIS FAMILY?

22   A.   HE USUALLY STAYS AT MY BROTHER'S HOUSE.

23   Q.   AND YOU ARE CLOSE ENOUGH FRIENDS FOR HIM TO PUT YOUR

24   NAME ON HIS PRISON VISITOR LOG LIST, RIGHT?

25          MR. PETERSON:  YOUR HONOR, I'M GOING TO OBJECT TO

1    THIS LINE OF QUESTIONING.

2              THE COURT:  OVERRULED.  THAT'S APPROPRIATE.

3              THE WITNESS:  YES.

4              MR. MILLER:  NO FURTHER QUESTIONS.

5              THE COURT:  REDIRECT?

6              MR. PETERSON:  NO FURTHER QUESTIONS.

7              THE COURT:  MAY THE WITNESS BE EXCUSED?

8              MR. PETERSON:  YES, YOUR HONOR.

9              MR. MILLER:  YES.

10             THE COURT:  THANK YOU VERY MUCH, SIR.

11             THE WITNESS:  THANK YOU.

12             THE COURT:  YOU ARE FREE TO LEAVE, STAY AND LISTEN.

13                        (WITNESS EXCUSED.)

14             THE COURT:  DO YOU WANT TO RESUME PLAYING THE

15   DEPOSITION THEN?

16             MR. MILLER:  YES.

17             THE COURT:  I BELIEVE YOU ARE ON PAGE 36, LINE 17

18   OR 18.

19             MR. MILLER:  18.  JUST SO YOU CAN BE AWARE OF THE

20   LOGISTICS, EACH TIME THAT I AM GOING TO SKIP ON THE VIDEO,

21   I'M GOING TO DEPRESS THE IMAGE, TURN OFF THE SOUND AND QUE IT

22   UP.

23             THE COURT:  THAT'S FINE.

24             MR. MILLER:  PLEASE BE PATIENT.

25             THE COURT:  THAT'S FINE.

```
1                        (VIDEOTAPE PLAYING.)

2              MR. MILLER:  IF I MAY HAVE THE COURT'S INDULGENCE,

3    IT MIGHT TAKE A MINUTE OR SO TO QUE UP EXACTLY.

4              THE COURT:  SURE.  MR. MILLER, LET'S STOP IT THERE.

5    LADIES AND GENTLEMEN, WE WILL TAKE OUR AFTERNOON RECESS FOR

6    THE DAY.  IT'S ALMOST 4:00 O'CLOCK.

7              I'VE GOT THREE OTHER MATTERS ON MY CALENDAR AT

8    9:00, NONE OF WHICH HAVE ANYTHING TO DO WITH THIS CASE.  SO,

9    I WILL BRING YOU BACK AT 9:15.  TOMORROW'S MATTER MAY GO A

10   LITTLE LONGER.  LET'S SAY 9:30.  ONE MAY BE A LITTLE MORE

11   CONTESTED THAN I ANTICIPATED.  LET'S SAY 9:30, FOLKS.

12              (WHICH WERE ALL THE PROCEEDINGS.

13              HELD IN THE ABOVE-ENTITLED CAUSE.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    CERTIFICATE OF REPORTER

2

3    COUNTY OF SAN DIEGO          )

4                                 )  SS.

5    STATE OF CALIFORNIA          )

6

7    I, MELISSA A. PIERSON, OFFICIAL COURT REPORTER, REGISTERED

8    PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

9    COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA, DO HEREBY

10   CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING

11   PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET FORTH;

12   THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY

13   MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER

14   CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY

15   STENOGRAPHIC NOTES.

16

17

18   DATE:  5-3-11

19

20   S:/MELISSA A. PIERSON

21   MELISSA A. PIERSON, CSR 12499 RPR

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25